ELIZABETH HERBERT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61138.    Filed April 15, 1958.

*John Holt Myers, Esq.*, for the petitioner.
*William Schwerdtfeger, Esq.*, for the respondent.

### FINDINGS OF FACT AND OPINION.

KERN, *Judge:* Respondent has determined deficiencies in petitioner's Federal income taxes for the years 1952 and 1953 in the respective amounts of $5,762.62 and $7,806.09. These deficiencies result from respondent's determination that petitioner (a British sub-

ject) "[has] been and [is] engaged in a trade or business through a permanent establishment in the United States and, therefore, * * * [does] not qualify for the reductions in the rate of tax provided by the Income Tax Convention between the United States and the United Kingdom." The "reductions in the rate of tax" above referred to are those provided by article VI (1) and article IX (1) of the income tax convention which provide that the rate of United States tax on dividends from a United States corporation and on rentals from real property in the United States, received by a subject of the United Kingdom, should be limited to 15 per cent if the recipient is subject to United Kingdom tax on such dividends and rentals and is "not engaged in trade or business in the United States." Article II (2) of the convention provides that a resident of the United Kingdom shall not be deemed to be engaged in trade or business in the United States unless he or she "has a permanent establishment situated therein." [1]

The petition alleges error in connection with the entire amount of the deficiences, and also alleges an overpayment of tax in the year 1952 in the amount of $1,207.50.

The parties have filed a stipulation of facts. There has also been filed and made a part of the record herein a deposition of petitioner together with certain exhibits identified therein. The stipulation, the exhibits attached thereto, and the exhibits identified in the deposition are incorporated herein and made a part of our findings of fact by this reference.

Petitioner is an individual who, during the calendar years 1952 and 1953 (and for some years prior thereto and until the present time), was a citizen of the United Kingdom domiciled and resident at Taunton, England. She filed her Federal nonresident alien income tax returns for the years 1952 and 1953 with the director of internal revenue at Baltimore, Maryland, and her departing alien income tax returns for the periods January 1 to December 15, 1952, and January 1 to December 4, 1953, with the Washington office of the Baltimore director of internal revenue.

During 1952 and 1953 petitioner owned 119 shares of the stock of the Virginia Hotel Company, there being 681 shares outstanding. Petitioner's sister, Belle Willard Roosevelt, who lives in New York City, also owned 119 shares and their mother owned 341 shares.

The Virginia Hotel Company is a domestic corporation existing under the laws of the State of Virginia. During the calendar years 1952 and 1953 its principal assets were an installment note arising from the sale of the Willard Hotel, Washington, D. C., and two parcels of District of Columbia realty. One parcel is a tract of land at Fourteenth Street and New York Avenue, N. W., improved by the

[1] The complete text of the convention between the United States and the United Kingdom is set forth in 1947–1 C. B. 209, *et seq.*

premises known as the Wyatt Building. The other parcel is in the middle of the 1400 block of Pennsylvania Avenue, N. W., improved with a building at 1417–1427 Pennsylvania Avenue and a parking garage.

In each of the years 1952 and 1953 petitioner received dividends on her Virginia Hotel Company stock in the amount of $12,566.40. In these years she also received rents from property located at 613 Fourteenth Street, N. W., Washington, D. C., in the respective amounts of $12,779.84 and $13,641.67. These dividends and rents constituted the only income received by petitioner from United States sources.

Petitioner visited the United States for approximately 2 months in each of the years 1952 and 1953. Prior to 1952 she came to this country every 2 or 3 years, or oftener if there was occasion, for a stay of similar duration. When she made these visits she attended meetings of the stockholders of the Virginia Hotel Company which the corporation usually arranged to coincide with her trips in order that she might "hear a report of what has been going on."

During the years 1949 to 1953, inclusive, the offices of the Virginia Hotel Company were located at 1107 Eye Street, N. W., Washington, D. C. On petitioner's return for the years 1949 to 1952, inclusive, in the space provided for her address it is stated "Address all communications to 1107 Eye Street, N. W., Washington 5, D. C." On her departing alien income tax return for 1952 she gives as her address "c/o The Virginia Hotel Co., 1107 Eye Street, N. W., Washington 5, D. C." On her 1953 returns she gives her address as 1107 Eye Street, N. W., Washington, D. C.

Similarly on a claim for refund relative to the year 1949 petitioner stated "Address all communications to 1107 Eye Street, Northwest, Washington, D. C."

The officers or employees of the Virginia Hotel Company keep on file in their offices copies of papers relating to petitioner's interest as a stockholder in that company which they send to petitioner, and also copies of tax returns which are prepared for petitioner without charge by the secretary of that company.

In August 1939 petitioner gave to her sister, Mrs. Roosevelt, an unlimited power of attorney as to any business or property matters which might arise. This power was in full force and effect at all times material hereto. As between petitioner and Mrs. Roosevelt it was understood that the latter would take no action under the power of attorney except as directly authorized by petitioner or in an emergency.

Marjorie Smith was, at all times material hereto, an employee of the Virginia Hotel Company. Marjorie had general instructions from petitioner to prepare her tax returns, and pursuant to that authority did prepare the annual Federal tax returns for the years 1949

to 1952, inclusive. Mrs. Roosevelt signed those returns for petitioner pursuant to the power of attorney without further authorization from petitioner. After they had been signed by Mrs. Roosevelt, Marjorie, by letters on the letterhead of the Virgina Hotel Company, sent the returns to the collector of internal revenue.

In 1907 or 1908 petitioner and her sister, Mrs. Roosevelt, received as a gift from their father a parcel of real estate located at 613 Fourteenth Street, N. W., Washington, D. C. They continued to hold this property throughout the period here involved as tenants in common. During the taxable period and for a number of years before and after, the premises were improved by a 3-story building.

On December 9, 1946, petitioner and Mrs. Roosevelt leased this entire property to Bruce Hunt, Inc., a corporation engaged in the business of selling men's clothing at retail. This lease was a modified extension of an earlier lease agreement between the same parties dated December 17, 1940. The lease extended to June 30, 1957, and provided that the rent was to be in the amount of $1,500 per month plus a percentage of gross sales. The percentage of sales was to be paid annually after the tenant submitted an accounting statement to the lessors.

Among other things, the lease provides that the landlord (petitioner and Mrs. Roosevelt) is to take care of repairs to the foundation and outer walls plus any alterations of a structural nature; that the tenant is to make all other repairs; and that if the tenant refuses to make the repairs chargeable to it, the landlord, his agents, or servants has or have the right to enter the premises and make such repairs at the tenant's expense.

The lease also provides that any notice, demand, election, or option by the lessee under the agreement shall be addressed to Mrs. Roosevelt; that in the case of an assignment of the tenant's rights thereunder the landlord must agree in writing thereto; and that the landlord shall pay all real estate taxes and assessments.

At all times material hereto Joseph Wyatt, a cousin of petitioner, was a practicing lawyer in Washington, D. C., and the president of the Virginia Hotel Company. Wyatt advised petitioner in connection with the negotiation of the lease to Bruce Hunt, Inc. Mrs. Roosevelt signed the lease on her sister's behalf, as well as for herself, pursuant to the power of attorney and also pursuant to petitioner's specific instructions after petitioner had approved its terms.

In October 1952 the written lease was modified by an oral amendment increasing the minimum rental and raising the monthly payments from $1,500 to $1,750. Wyatt also negotiated this amendment, represented petitioner relative thereto, and advised her in the premises. The lease was near expiration at the time of the hearing herein, and Bruce Hunt, Inc., had not yet exercised its renewal option.

Wyatt was conferring with the tenant as to renewal of the lease, acting on behalf of petitioner in that regard and advising her accordingly. Wyatt has never been remunerated in any way for his services to petitioner in connection with this property nor is any remuneration contemplated.

No repairs or renovations to the premises were made by petitioner and Mrs. Roosevelt during the years 1949 to 1953, but in 1954 a portion of the marble store front was replaced at a cost of $585.54. The president of Bruce Hunt, Inc., notified Wyatt that two of the marble facing pieces were damaged. The latter authorized replacement thereof and notified petitioner and Mrs. Roosevelt of the situation. He also requested Commander William Rigdor, an employee of the Virginia Hotel Company, to inspect the store front and to negotiate for the replacement and repairs. Payment was advanced by the Virginia Hotel Company and repayment was promptly made by petitioner and her sister.

In 1955 the rear windows of the premises were removed and bricked up at a cost of $546 and a new roof was put in place at a cost of $880. In these instances the president of the tenant corporation notified Commander Rigdon who in turn notified Wyatt and Paul F. Myers, attorney for the estate of Belle L. Willard, petitioner's mother, who had died on January 28, 1954. At the direction of Wyatt and Myers, Commander Rigdon inspected the premises. Myers then advised petitioner of the need for and estimated cost of the renovations. Mervyn Herbert, petitioner's son, acting on her behalf, authorized that the work be done. Commander Rigdon then made the necessary arrangements. In each case, upon presentation of the bill, payment was advanced by the Virginia Hotel Company, and petitioner and her sister promptly made reimbursement.

During the years in question the monthly rental checks ($1,500 until October 1952 and $1,750 thereafter) from the lessee were drawn to the order of Belle Willard Roosevelt and mailed to her at 1107 Eye Street, Washington, D. C.

Generally such checks were deposited at a Washington bank in an account designated:

Mrs. Belle Willard Roosevelt, Special,
9 Sutton Place
New York 22, New York

The checks were deposited by Marjorie Smith of the Virginia Hotel Company after she endorsed them by typewriter. Checks on this account were made out by Marjorie and forwarded to Mrs. Roosevelt for signature, Marjorie making the entries on the check stubs. The statements for this account were mailed by the bank to Mrs. Roosevelt in New York, and returned by her to Marjorie who then compared them with the entries on the stubs.

After reserving approximately 30 per cent for the payment of such charges as insurance, real estate taxes, interest, and principal on the mortgage, the remainder of the monthly rental payments was disbursed by checks drawn on the account by Mrs. Roosevelt. One check was drawn to the order of Mrs. Roosevelt and two other checks, totaling the amount of the check to Mrs. Roosevelt, were drawn to petitioner's order. Of these two checks to petitioner one was 70 per cent of the total and the other 30 per cent. The larger check was sent to England for deposit to petitioner's bank account there, while the smaller check was sent to the National City Bank of New York for deposit to another account of petitioner.

During 1952 and 1953 the tenant paid, in addition to the monthly payments, the further amounts based upon a percentage of sales in accordance with the terms of the lease. This supplemental sum paid in 1952 (based upon 1951 sales) amounted to $7,559.67 and in 1953 (based upon 1952 sales) amounted to $8,000. The $7,559.67 was paid in 6 installments and the $8,000 in 5 installments. These amounts were also paid by checks drawn to the order of Mrs. Roosevelt, mailed to the offices of the Virginia Hotel Company, and deposited to the special account in her name. In this instance no 30 per cent was reserved for the payment of insurance, taxes, and mortgage installments; rather the full amounts were divided between Mrs. Roosevelt and petitioner, one check being drawn to the former and two checks to the latter. Of the two checks to petitioner, as with the monthly rentals, the larger was sent for deposit to her account in London and the other to New York. Her son's secretary keeps a record in England of the checks forwarded to her as her share of the rental.

On October 5, 1939, petitioner and Mrs. Roosevelt gave the Riggs National Bank, Washington, D. C., a note for $30,000 secured by a deed of trust on the property at 613 Fourteenth Street. The note was payable in semiannual installments of $300 with interest at 4 per cent on the unpaid balance. Wyatt negotiated the loan and deed of trust for petitioner and Mrs. Roosevelt.

During the years 1952 and 1953 petitioner made the following payments relative to the property at 613 Fourteenth Street:

|  | 1952 | 1953 |
|---|---|---|
| Second half current year's D. C. real estate taxes | $939.12 | $939.12 |
| Note principal (first semiannual installment) | 150.00 | 150.00 |
| Interest on note | 228.00 | 222.00 |
| Plate glass insurance | 88.99 | 83.58 |
| Fire insurance | | 73.08 |
| Boiler insurance | | 115.50 |
| First half next year's D. C. real estate taxes | 939.12 | 939.12 |
| Note principal (second semiannual installment) | 150.00 | 150.00 |
| Interest on note | 225.00 | 219.00 |
| Total | 2,720.23 | 2,891.40 |

The above amounts represent petitioner's one-half of the checks made out by Marjorie Smith on the special account in the name of Mrs. Roosevelt and signed by the latter.

In February 1952 and 1953 the tenant, as required by the lease, mailed or delivered a report of its auditors advising of the amount of sales for the preceding year. Petitioner gave these reports to her son who examined them on her behalf. Copies of business documents and correspondence are kept by petitioner in England either at her home or her son's office.

No independent audit or investigation has been made with respect to the gross sales or percentage rental payments made by the tenant since the making of the current lease by or on behalf of the petitioner or her sister. However, in 1946 petitioner and Mrs. Roosevelt employed a certified public accountant who made an investigation of the rental payments due from the tenant for the calendar years 1944 and 1945 under the prior lease which had been extended in a modified form through the taxable years.

During 1952 and 1953 petitioner's mother, Belle Wyatt Willard, owned a substantial amount of real property as well as the majority of the stock of the Virginia Hotel Company. In those years Belle Wyatt Willard was elderly, in fragile health, and unable to manage her own affairs. Under the terms of her mother's will, petitioner had a life interest in one-half of the estate. Sometime prior to 1950 petitioner consulted a New York attorney relative to "various changes to be made in the Virginia Hotel Company and my mother's properties."

For the years 1949, 1950, and 1951 petitioner elected to file her Federal income tax returns and be taxed as a nonresident alien engaged in a trade or business in this country.[2]

The arguments of the parties are directed toward two questions: (1) Whether petitioner by reason of the transactions incident to the management of the Fourteenth Street property was engaged in a trade or business in the United States within the meaning of article IX of the United States–United Kingdom tax convention, and (2) whether petitioner had "a permanent establishment situated" within the United States during the taxable years within the purview of article II (2) of the tax convention.

The provisions of article IX clearly indicate the recognition by the United States that the ownership and leasing of real property do not constitute per se engaging in trade or business. That article limits the rate of United States tax "on rentals from real property or from

---

[2] Article IX of the convention contains the following language: "Provided that any such resident [of the United Kingdom] may elect for any taxable year to be subject to United States tax as if such resident were engaged in trade or business in the United States."

an interest in such property, derived from sources within the United States by a resident of the United Kingdom who is * * * not engaged in trade or business in the United States." If the ownership and leasing of real property were considered to constitute a trade or business, that provision would be meaningless since on this hypothesis no one could be not engaged in trade or business in the United States who received rentals from real estate located within the United States. That the ownership and leasing of real property, the collection of rentals therefrom, and the performance of certain minimal acts customarily incident to the ownership of real property do not constitute engaging in trade or business is recognized in *Evelyn M. L. Neill*, 46 B. T. A. 197.

However, where the activities of the nonresident alien "are beyond the scope of mere ownership of real property, or the receipt of income from real property" and are "considerable, continuous, and regular" it has been held (although not in a case construing the provisions of the United States–United Kingdom tax convention) that such activities of the nonresident alien constitute engaging in a business. See *Jan Casimir Lewenhaupt*, 20 T. C. 151, 163.

In the instant case the real property consisted of one building rented in its entirety to one tenant who has occupied it since 1940, has complete charge of its operation, and is responsible for all repairs except as to outer walls and foundation. This property (the only real property owned by petitioner in the United States) was acquired by petitioner 50 years ago, not as the result of a business transaction entered into for profit (cf. *Fackler* v. *Commissioner*, 133 F. 2d 509) but by gift from petitioner's father when she was a very young girl (see *Grier* v. *United States*, 120 F. Supp. 395). During the taxable years her only activities, in addition to the receipt of rentals, were the payment of taxes, mortgage principal and interest, and insurance premiums. See *Evelyn M. L. Neill, supra*. The record also shows that petitioner executed a lease of the property in 1940 and a modified renewal thereof in 1946, and made minor repairs to the walls and roof in 1954 and 1955.

We are of the opinion that petitioner's activities with regard to the real property here involved, which might be considered as "beyond the scope of mere ownership of real property, or the receipt of income from real property," were sporadic rather than "continuous," were irregular rather than "regular," and were minimal rather than "considerable." We therefore conclude that petitioner was "not engaged in trade or business in the United States" during the taxable years within the meaning of article IX (1) of the United States–United Kingdom tax convention.

34

This conclusion relates solely to the interpretation of the pertinent provisions of the tax convention and is not intended to relate in any way to the possibly wider meaning accorded to the word "business" in some of the provisions of the Internal Revenue Code.

In view of the foregoing it is unnecessary for us to determine whether petitioner during the taxable years had "a permanent establishment situated" in the United States. The phrase "permanent establishment" is defined in article II (1) (l) of the tax convention as follows:

The term "permanent establishment" when used with respect to an enterprise of one of the contracting parties means a branch, management, factory or other fixed place of business, but does not include an agency unless the agent has, and habitually exercises, a general authority to negotiate and conclude contracts on behalf of such enterprise or has a stock of merchandise from which he regularly fills orders on its behalf. An enterprise of one of the contracting parties shall not be deemed to have a permanent establishment in the territory of the other contracting party merely because it carries on business dealings in the territory of such other contracting party through a *bona fide* commission agent, broker or custodian acting in the ordinary course of his business as such. The fact that an enterprise of one of the contracting parties maintains in the territory of the other contracting party a fixed place of business exclusively for the purchase of goods or merchandise shall not of itself constitute such fixed place of business a permanent establishment of such enterprise. The fact that a corporation of one contracting party has a subsidiary corporation which is a corporation of the other contracting party or which is engaged in trade or business in the territory of such other contracting party (whether through a permanent establishment or otherwise) shall not of itself constitute that subsidiary corporation a permanent establishment of its parent corporation.

In the light of this definition, it is difficult to conceive what and where petitioner's "permanent establishment" in the United States might be.

*Decision will be entered under Rule 50.*