INEZ DE AMODIO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOHN AMODIO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 74211, 74297. Filed August 22, 1960.

*Lee W. Eckels, Esq.,* and *William W. Scott, Jr., Esq.,* for the petitioners.

*Gerald Backer, Esq.,* for the respondent.

TIETJENS, *Judge:* The respondent determined deficiencies in income tax as follows:

| Calendar year | Docket No. 74297 John Amodio | Docket No. 74211 Inez de Amodio |
|---|---|---|
| 1951 | $20,763.08 | |
| 1952 | 20,555.92 | |
| 1953 | 19,486.81 | $4,550.74 |
| 1954 | 14,665.03 | 365.69 |

The petitioners are brother and sister. Their proceedings were consolidated as both cases involve the issue whether the petitioners are taxable on the capital gains realized by a trust of which they were the grantors and beneficiaries. This is the sole issue in the case of Inez. Other issues in the case of John are whether he is taxable on a "net basis" on all dividend, interest, and rental income with respect to all income derived from sources in the United States under the terms of the United States-Swiss tax convention and whether he is taxable on capital gains from sales of capital assets other than those of the trust. By amendment to the petition, John also alleges that through tax payments made on his account by the trustee of the trust and by the Swiss Confederation under the convention and by withholding agents in the United States his taxes for the years involved have been overpaid and asks a determination of such overpayment. Certain facts are stipulated.

### FINDINGS OF FACT.

Returns of John Amodio for 1951, 1952, and 1953 and a return for Inez for 1953 were filed with the collector or director of internal revenue at Pittsburgh. Inez filed a return for 1954 with the director for the Upper Manhattan District, New York. John Amodio's return for 1954 was filed with the director of internal revenue at Baltimore, Maryland.

Inez de Amodio was a resident of the United States in 1953 and 1954. John Amodio (also known as John Julio Amodio) is a nonresident alien who resides in Switzerland. These petitioners are daughter and son of Josephine Wainwright de Amodio.

Joseph G. Wainwright, the father of Josephine, arranged for the creation of a trust, herein referred to as the Wainwright trust, on March 14, 1900. The trust corpus was real property in Texas; some in Dallas, some in El Paso. The income from the property was to be paid to Josephine during her lifetime. If upon her death her children had all reached the age of 21 years, all the property was to vest in the surviving heirs. The first trustee was Joseph G. Wainwright, who died in 1902. Other trustees were thereafter appointed by the beneficiary. The last trustee was John A. Byerly, appointed in 1934. Josephine died on April 7, 1948, at which time the petitioners, the only children and heirs of Josephine, were both over 21 years of age.

On January 11, 1947, the petitioners entered into an agreement with Byerly concerning their interests in the Wainwright trust. This agreement was referred to as the Amodio trust and provided in general for the administration by Byerly, as trustee, of the property of the Wainwright trust which would come to the petitioners

upon the termination of that trust when their mother died. The petitioners were the grantors and equal beneficiaries. The agreement provided that the trustee, as soon as practicable, was to liquidate a sufficient amount of the property to pay each of the petitioners $40,000 in cash. The agreement further provided:

5. Without in any way limiting or restricting the generality of the foregoing provisions, the Trustee shall have powers as follows, with reference to any and each asset at any time constituting a part of the trust estate:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) To consent to the extension, refunding or renewal of any security, obligation, lien, contract or right.

(f) To improve all or any real property; to erect buildings on all or any real property, in addition to or in substitution for the buildings at any time existing thereon, of such character and cost, and upon such terms of payment, as the Trustee shall deem advisable; to borrow money and create liens upon property and/or rents, for such purpose or for any other purpose; provided, however, that our said Trustee is authorized and empowered to reserve and set aside, at the end of each month, out of the gross current income realized in cash during said period from the property then embraced in this trust, such an amount, not exceeding 5% of said gross current income, as to him shall seem proper. The amount so reserved shall be held and accumulated by him as an improvement fund; and shall be invested by him from time to time, at such intervals and in such manner as shall seem to him to be for the best interests of the trust, in permanent improvements upon the real property embraced in the trust, or in the purchase of additional revenue-yielding property.

(g) To mortgage real and/or personal property, to such extent, and upon such terms and conditions, and for such purposes, as the Trustee shall deem advisable.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

6. We, the settlors, shall be the primary beneficiaries of this trust. We shall be considered the equitable owners of both the income and the corpus of the trust, in equal shares. One-half of the net income of the trust shall be payable to each of us for life. If the first of us to die shall die without leaving lawful issue (heirs of the body) surviving him or her, then, and in that event, all interest in the corpus and income of the trust shall go to and become the exclusive property of the surviving settlor. Upon the death of the survivor of us, this trust shall terminate, and the interest of the survivor in the trust (whether it be only a one-half interest or the full interest) shall be distributed absolutely, free of trust, as specified and directed in his or her will, or if not specifically disposed of in such will, then to the beneficiaries of the residue of his or her estate; or, if such survivor dies intestate, then to such person or persons as would take according to the laws of descent and distribution of the State of Texas, as then existing. Provided, however, that if either of us shall die before the death of the other, leaving lawful issue (heirs of the body) living at the time of his or her death, the share of such deceased settlor in the corpus and income of the trust property shall go to and vest in such lawful issue of such decedent as may be living at the death of such decedent (taking per stirpes and without preference because of any circumstance of sex

or order of birth), but such beneficiary or beneficiaries shall not receive any of the trust property corpus (only income from time to time) until the trust is terminated in the manner hereinafter specified. And provided further that this clause 6 shall not affect the right of the survivor to revoke or terminate this trust at any time by his or her sole action under clause 8 hereinafter; but any right of the deceased person to join or be consulted in the termination of the trust, under clause 8 hereinafter, shall not survive to or be enjoyed by the issue of said decedent. During the continuance of the trust, our Trustee hereunder shall continue to act as the Trustee of any of said beneficiaries who may not be sui juris.

\* \* \* \* \* \* \*

8. This trust may be amended in any way or terminated at any time by the joint action of all the beneficiaries of the income from the trust, and such action shall become effective upon the filing in the Deed Records of Dallas County, Texas, of an instrument amending or terminating this trust.

\* \* \* \* \* \* \*

11. The Trustee shall have the power at any time, upon the joint request, in writing, of all beneficiaries of this trust, to make a complete or partial distribution of the corpus of the trust estate to any primary beneficiary or any and each successor beneficiary or any guardian or other legal representative of any beneficiary, of the beneficial interest of such beneficiary in the corpus of the trust estate. Upon the written request of either of us, at any time after five years from the date the trust property comes into the hands of our Trustee, the Trustee shall pay over to each of us the sum of $5,000 from the corpus of the trust, as soon after such request as the required portion of the trust property can be liquidated. After an additional period of two years from such first $5,000 payment to each of us, upon the written request of either of us, the Trustee shall pay over to each of us an additional sum of $5,000 from the corpus of the trust, as soon after such request as the necessary partial liquidation may be effected. After an additional period of two years from such second $5,000 payment to each of us, upon the written request of either of us, the Trustee shall pay over to each of us an additional sum of $5,000 from the corpus of the trust, as soon after such request as the necessary additional partial liquidation may be effected.

The Amodio trust agreement was accepted by Byerly, as trustee. Shortly thereafter he wrote each of the petitioners as follows:

As a condition of my appointment and acceptance, I have agreed and do now agree that, so long as either of you may live and be capable of acting, no sale or conveyance of trust real property shall be made without the written consent of the Settlor and Settlors (yourselves) then living, first had and obtained; provided, however, that if for any reason, though using due diligence, I should be unable to communicate with or receive written instructions from either or both of you for a period of three months from the date of my inquiry or advice, it is agreed that I shall have full authority and power to make any sale of real property that I, in my sole discretion, may deem for the best interests of the Trust Estate.

Further, I agree not to exercise any of the other powers specifically granted by clauses 5(c), 5(e), 5(f), 5(g), 5(m), 5(o) and/or 5(q) of said trust instrument, or any of them, until after the consent in writing of yourselves or

the survivor of you, if one of you shall have died, first had and obtained; provided, however, that if for any reason, using all due diligence, I shall be unable to communicate with or receive written instructions from either or both of you for a period of two months, it is agreed that I shall have full authority and power to exercise any of said powers as I may, in my sole discretion, deem for the best interests of the Trust Estate; and provided, further, that the failure of either of you to give me specific instructions in writing on the subject of any inquiry or advice concerning the proposed exercise by me of any of the powers enumerated and provided in said clauses 5(c), 5(e), 5(f), 5(g), 5(m), 5(o) and/or 5(q), for a period of two months from the date of my inquiry or advice, shall irrevocably be deemed to be equivalent to written consent by such person to the proposed action by me as Trustee.

Byerly designated Fidelity Trust Company as his agent to manage the Amodio trust. The trust was known as Trust #18372 in Fidelity's records.

The petitioner Inez was born in 1904. She has been married and divorced. She had no children. Petitioner John Amodio was born in 1909, was educated in England, and served in the Royal Volunteer Reserve of the Royal Air Force in World War II. After the war he lived in Switzerland and applied for right of domicile there which was granted him in 1948. He visited the United States late in 1946 with Josephine and Inez. The Amodio trust agreement was drawn up on the occasion of that visit and was signed at Pittsburgh. As a result of some objections by Inez, Byerly wrote the letter quoted above as conditioning his trusteeship. Amodio returned to Europe early in 1947. Josephine died in Switzerland in 1948. Amodio married in 1948 and next visited the United States in 1949, going to Pittsburgh, Dallas, El Paso, and into Mexico. While in Dallas he looked at some real property with a view to purchase. He appointed an agent who contracted on Amodio's behalf to purchase property on Ross Avenue in Dallas. Amodio returned to Europe at the end of 1949. The purchase of the Ross Avenue property was completed by the agent on March 6, 1950. The property contained a 1-story brick building and was acquired at a cost of $48,000, including the assumption of a mortgage in the amount of $18,260.89. At the time of acquisition by Amodio, the entire property was leased for a term of 5 years from June 15, 1949, at a rental of $500 per month.

The collection of the monthly rentals was handled by Moser Company, a Dallas real estate firm. This firm received the checks for the monthly rentals and, after paying certain expenses and deducting a 5 per cent commission, remitted the balance to Fidelity. Moser Company paid to the City of Dallas in 1951 the amount of a paving assessment against the property and $386 to a roofing company for repairs.

Fidelity received from the Moser Company the monthly remittances constituting the rentals less the deduction of Moser Company's commission and the other disbursements described. From such proceeds, Fidelity made monthly payments of mortgage principal and interest, paid to itself quarterly commission charges, paid premiums on fire insurance and public liability insurance, and paid city and school taxes, State and county taxes, and an assessment of the Dallas Health Department. Pursuant to an option in the lease, the lessee exercised the right to renew the lease for a 5-year period commencing in 1954.

Amodio came to the United States in 1950 for a brief visit and opened an investment account with Brown Brothers Harriman and Co. in New York City. He arranged with Fidelity Trust to have Fidelity prepare and file his United States income tax returns. In September and October 1951 he visited the United States for about 11 days and attended an exhibition of paintings loaned by him to the Dallas Museum. Before arriving he wrote his agent in Dallas expressing a desire to look at other income-producing real property available for purchase. While in Dallas he looked at real property on Greenville Avenue with a view to purchase as an investment and authorized his agent to effect the purchase of this property. From Switzerland he later directed Brown Brothers Harriman and Co. to sell some bonds to provide funds for the purchase of this property, which purchase was effected at the end of 1951. The cost of the Greenville Avenue property was $90,000, including the assumption of a mortgage of $25,500. This property contained a 1-story brick building with 6 rental units. The collection of rentals and the payment of expenses with respect to this property was handled by J. W. Lindsley & Co., a Dallas real estate firm. Certain leases were in force which expired in 1952 or 1953 and which the agent renewed for further terms. The agent secured two new tenants, one for a term commencing in 1952, the other for a term commencing in 1954. The agent collected rentals, deducted commissions of 5 per cent, made mortgage payments of $500 monthly plus interest, and paid insurance premiums and taxes and arranged for repairs in these years.

The rental properties owned by the Amodio trust in the taxable years were parcels of improved real estate in Dallas and El Paso, Texas, and Pittsburgh, Pennsylvania. The Texas properties were managed by resident agents who collected rents, made repairs, and acquired tenants.

Amodio did not visit the United States in 1952, 1953, or 1954. While in the United States during 1951 he effected no sales, exchanges, or other dispositions of capital assets.

The rental income and expenses of the Ross Avenue property were:

| | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|
| Gross rents | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 |
| Commissions—Moser | 300.00 | 300.00 | 300.00 | 300.00 |
| Commissions—Fidelity | 240.00 | 240.00 | 240.00 | 240.00 |
| Assessments | 213.15 | | 632.30 | |
| Repairs | 386.00 | | 21.80 | |
| Insurance | 335.93 | 6.35 | 845.76 | |
| Taxes | 584.93 | 584.93 | 648.70 | 680.49 |
| Mortgage principal | 2,428.11 | 2,539.68 | 2,656.33 | 2,778.34 |
| Mortgage interest | 684.69 | 573.12 | 456.47 | 334.46 |
| Available to Amodio | 827.18 | 1,755.91 | 198.64 | 1,643.17 |

The rental income and expenses of the Greenville Avenue property were:

| | 1952 | 1953 | 1954 |
|---|---|---|---|
| Rent (agent's commission 5 per cent) | $11,365.00 | $10,610.00 | $6,890.00 |
| Mortgage payment (plus interest) | 6,000.00 | 6,000.00 | 6,000.00 |
| Insurance | 15.57 | 883.76 | 1,216.29 |
| Taxes | 1,111.14 | 1,230.19 | 1,290.12 |
| Repairs | 1,315.19 | 177.43 | 105.32 |
| Sent to Amodio | 2,162.58 | 1,836.49 | none |

In preparing Amodio's United States income tax returns Fidelity computed his net rental income as follows:

| | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|
| Gross rents | $6,000.00 | $17,365.00 | $16,610.00 | $12,890.00 |
| Depreciation | 910.64 | 3,328.41 | 3,328.41 | 3,328.41 |
| Expenses | 3,608.05 | 4,686.56 | 5,926.21 | 4,028.22 |
| Repairs | | 1,315.19 | 177.43 | 105.32 |
| Net rents | 1,481.31 | 8,034.84 | 7,177.95 | 5,428.05 |

The returns reported income from the Amodio trust and the Wainwright trust as follows:

| | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|
| Amodio | $10,560.02 | $10,392.06 | $10,763.24 | $11,586.54 |
| Wainwright | 1,124.73 | 1,106.65 | 679.06 | 496.38 |

The returns showed the following additional items of income from dividends and interest and rents from Amodio's agency account, the Amodio trust, the Wainwright trust, and Brown Brothers Harriman and Co. from which tax was withheld at the rate of 15 per cent on dividends and 5 per cent on interest and 30 per cent on rents.

| | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|
| Agency account: | | | | |
| Dividends | $1,813.00 | $1,949.00 | $1,799.00 | $2,147.30 |
| Rents | | 3,197.37 | 2,936.29 | 3,272.75 |
| Wainwright: | | | | |
| Dividends | 137.98 | 173.26 | 213.52 | 232.05 |
| Interest | 264.33 | 234.08 | 175.06 | |
| Rents | | 1,106.65 | 679.06 | 491.39 |
| Amodio trust: | | | | |
| Dividends | 2,006.59 | 3,974.33 | 4,337.08 | 4,732.83 |
| Interest | 2,654.05 | 1,108.69 | 790.66 | 412.80 |
| Rents | | 10,392.06 | 10,910.15 | 11,586.54 |
| B.B.H. dividends | 23,331.75 | 24,811.91 | 20,950.15 | 21,926.80 |

Byerly filed returns for the Amodio trust for the taxable years 1951 through 1954, which showed the following items:

| | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|
| Rents | $38,947.13 | $40,052.50 | $41,701.31 | $43,257.00 |
| Depreciation | 3,634.71 | 4,040.79 | 4,308.03 | 4,516.41 |
| Repairs | | | 776.00 | |
| Other expenses | 14,264.23 | 15,227.60 | 15,090.79 | 16,120.20 |
| Net profit | 21,048.19 | 20,784.11 | 21,526.49 | 22,620.39 |
| Dividends | 4,224.40 | 8,367.00 | 9,130.70 | 9,963.84 |
| Interest | 5,532.55 | 2,334.08 | 1,653.27 | 880.09 |

In 1953 the Amodio trust realized a net long-term capital gain of $33,018.68 and took into account 50 per cent or $16,509.34.

John Amodio was a resident of Switzerland in the years 1951 through 1954. In these years he was engaged in business in the United States through his agents in the ownership and management of income-producing real property. In these years he did not have a permanent establishment in the United States.

The stipulated facts are found as stipulated.

### OPINION.

The issue common to both cases is whether the properties constituting the corpus of the Amodio trust should be considered as jointly owned by the petitioners, who were the grantors and equal beneficiaries of that trust. Under the trust instrument the petitioners were each to receive as early as possible $40,000 in cash. Each could withdraw $5,000 in cash from the corpus upon request at 2-year intervals. By joint action they could terminate or amend the trust at any time and revert title to the corpus in themselves in whole or in part. Under the provisions of section 166 of the Internal

Revenue Code of 1939 [1] the income of any part of a trust is to be included in computing net income of the grantor if the power to revest title in the grantor is held by the grantor alone or in conjunction with any person not having an adverse interest. Under section 676 of the Internal Revenue Code of 1954 [2] a grantor is to be treated as owner of any portion of a trust if at any time the power to revest title in him is exercisable by him or a nonadverse party, or both. If the interests of these two petitioners were not adverse to each other, they should be treated under the cited provisions of law as coowners of the property constituting the corpus, the trust should be disregarded as a separate entity and the capital gains and losses of the trust treated as gains and losses of the petitioners.

The petitioners contend that they had interests substantially adverse to each other. The argument is that if one petitioner survives the other, the survivor acquires the entire corpus including the accumulated capital gains, since neither petitioner had children and each was the sole potential heir of the other under the terms of the trust.

The practical effect of the Amodio trust was that the petitioners turned over their interests to the trustee for current management of the properties constituting the corpus and retained the right jointly to change the terms of the contract or terminate it and take possession of their shares.

In *Welch* v. *Bradley*, 130 F. 2d 109 (C.A. 1, 1942), a mother and daughter were grantors and beneficiaries of a trust of which the mother was trustee. Each could appoint by will the devolution of her share. Together they could terminate the trust and take their respective shares. The daughter was the sole heir of the mother. The court concluded that neither had, as against the other, a substantial interest adverse to the revocation of the trust. The reasoning in the foregoing case is applicable here. The interests of Amodio and his sister were not adverse to each other. The statutes cited

---

[1] SEC. 166. REVOCABLE TRUSTS.

Where at any time the power to revest in the grantor title to any part of the corpus of the trust is vested—

(1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,

\* \* \* \* \* \* \*

then the income of such part of the trust shall be included in computing the net income of the grantor.

[2] SEC. 676. POWER TO REVOKE.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under any other provision of this part, where at any time the power to revest in the grantor title to such portion is exercisable by the grantor or a non-adverse party, or both.

clearly apply and the capital gains of the Amodio trust are includible as income of the petitioners as the respondent determined.

This conclusion disposes of the sole issue in the case of Inez. The remaining issues concern the case of John Amodio.

The scheme of taxation of nonresident aliens provided under section 211 of the 1939 Code and section 871 of the 1954 Code distinguished between such aliens engaged in trade or business in the United States and those not so engaged.

The respondent determined that Amodio was taxable as a nonresident alien engaged in trade or business in the United States. The contention is that Amodio was engaged in business in the United States by reason of his ownership and operation of rental real properties, first, the properties owned in his own right and, second, the properties constituting the corpus of the Amodio trust of which he was coowner.

Amodio contends that he was a nonresident alien who resides in Switzerland, that he could not be considered as engaged in trade or business in the United States by reason of the ownership of real property in the United States and that he did not elect, pursuant to provisions of the income tax convention between the United States and the Swiss Confederation (hereinafter referred to as the convention) to be taxed by the United States as so engaged.

Under article IX of the convention,[3] income from real property in the United States, including gains from sales thereof, is to be taxed only in the United States. The pertinent regulation, section 509.111,[4]

---

[3] T.D. 6149, 1955-2 C.B. 814-836.

ARTICLE IX

(1) Income from real property (including gains derived from the sale or exchange of such property but not including interest from mortgages or bonds secured by real property) * * * shall be taxable only in the contracting State in which such property * * * [is] situated.

(2) A resident * * * of one of the contracting States deriving any such income from such property within the other contracting State may, for any taxable year, elect to be subject to the tax of such other contracting State, on a net basis, as if such resident or corporation or entity were engaged in trade or business within such other contracting State through a permanent establishment therein during such taxable year.

[4] Sec. 509.111 REAL PROPERTY INCOME AND NATURAL RESOURCE ROYALTIES—(a) *General.*—Income of whatever nature derived by a nonresident alien who is a resident of Switzerland, * * * from real property situated in the United States, including gains derived from the sale or exchange of such property, [and] rentals from such property * * * is not exempt from United States tax by the convention. Such items of income are subject to taxation under the provisions of the Internal Revenue Code of 1954 generally applicable to the taxation of nonresident alien individuals and foreign corporations. See Article IX of the convention. * * *

(b) *Net basis*—(1) *General.*—Notwithstanding the provisions of paragraph (a) of this section, a nonresident alien who is a resident of Switzerland, or a Swiss corporation or other entity, who during the taxable year derives from sources within the United States any income from real property as described in such paragraph may elect for such taxable year to be subject to United States tax on a net basis as though such alien, corporation, or other entity were engaged in trade or business in the United States during such year through a permanent establishment situated therein.

904

states that income derived by a nonresident alien residing in Switzerland from real property in the United States is not exempt from United States tax but is taxable under the provisions of the Internal Revenue Code of 1954 generally applicable to nonresident aliens.

According to the convention, article II(1)(f), a "Swiss enterprise" means an industrial or commercial enterprise or undertaking carried on in Switzerland by an individual resident in Switzerland or by a Swiss corporation or other entity. Since Amodio carried on no business activity in Switzerland, he was not engaged in a Swiss enterprise within the meaning of the convention.

The regulations implementing the convention provide in section 509.105(a)(2),[5] that a nonresident alien individual who is a citizen of Switzerland, carrying on an enterprise which is not Swiss, is subject to tax on the income thereof under section 871(c), I.R.C. 1954, if he has engaged in trade or business within the United States at any time during the taxable year.

In *Jan Casimir Lewenhaupt*, 20 T.C. 151 (1953), affd. 221 F. 2d 227 (C.A. 9 1955), we held that a nonresident alien was engaged in business in the United States through his activities connected with the ownership of real property in the United States and the management of such property through a resident agent. We there stated (p. 163):

The petitioner, prior to and during the taxable year, employed LaMontagne as his resident agent who, under a broad power of attorney which included the power to buy, sell, lease, and mortgage real estate for and in the name of the petitioner, managed the petitioner's real properties and other financial affairs in this country. The petitioner, during all or a part of the taxable year, owned three parcels of improved, commercial real estate. The approximate aggregate fair market value of the three properties was $337,000. In addition, the petitioner purchased a residential property, and through his agent, LaMontagne, acquired an option to purchase a fourth parcel of commercial property, herein referred to as the El Camino Real property, at a cost of $67,500. The option was exercised and title to the property conveyed to the petitioner in January 1947.

La Montagne's activities, during the taxable year, in the management and operation of petitioner's real properties included the following: executing leases and renting the properties, collecting the rents, keeping books of account, supervising any necessary repairs to the properties, paying taxes and mortgage interest, insuring the properties, executing an option to purchase the El Camino Real property, and executing the sale of the Modesto property. In addition, the agent conducted a regular correspondence with the petitioner's father in England who held a power of attorney from petitioner identical

---

[5] Sec. 509.105 INDUSTRIAL AND COMMERCIAL PROFITS—(a) GENERAL.—(1) * * *

(2) * * * a nonresident alien individual who is a citizen of Switzerland * * * carrying on an enterprise which is not Swiss, is subject to tax on such income of such enterprise pursuant to section 871(c), * * * Internal Revenue Code of 1954, if such alien * * * has engaged in trade or business in the United States at any time during the taxable year, * * *

with that given to LaMontagne; he submitted monthly reports to the petitioner's father; and he advised him of prospective and advantageous sales or purchases of property.

The aforementioned activities, carried on in the petitioner's behalf by his agent, are beyond the scope of mere ownership of real property, or the receipt of income from real property. The activities were considerable, continuous, and regular and, in our opinion, constituted engaging in a business within the meaning of section 211(b) of the Code. See *Pinchot* v. *Commissioner*, 113 F. 2d 718.

Amodio contends that the *Lewenhaupt* case is not applicable in the circumstances of his case. He cites *Evelyn M. L. Neill*, 46 B.T.A. 197 (1942), and *Elizabeth Herbert*, 30 T.C. 26 (1958). In the *Neill* case the taxpayer inherited property which was leased for a long term to a tenant who was required to pay taxes and insurance and to maintain the property and no substantial activity on the part of the taxpayer or her agent was necessary. Under those circumstances it was held that the taxpayer was neither engaged in business in the United States nor maintaining an office or place of business therein.

In *Elizabeth Herbert, supra*, we held that a nonresident alien was not engaged in trade or business in the United States through the ownership of real property in the United States in the circumstances there present. We there stated (p. 33):

In the instant case the real property consisted of one building rented in its entirety to one tenant who has occupied it since 1940, has complete charge of its operation, and is responsible for all repairs except as to outer walls and foundation. This property (the only real property owned by petitioner in the United States) was acquired by petitioner 50 years ago, not as the result of a business transaction entered into for profit (cf. *Fackler* v. *Commissioner*, 133 F. 2d 509) but by gift from petitioner's father when she was a very young girl (see *Grier* v. *United States*, 120 F. Supp. 395). During the taxable years her only activities, in addition to the receipt of rentals, were the payment of taxes, mortgage principal and interest, and insurance premiums. See *Evelyn M. L. Neill, supra*. The record also shows that petitioner executed a lease of the property in 1940 and a modified renewal thereof in 1946, and made minor repairs to the walls and roof in 1954 and 1955.

We are of the opinion that petitioner's activities with regard to the real property here involved, which might be considered as "beyond the scope of mere ownership of real property, or the receipt of income from real property," were sporadic rather than "continuous," were irregular rather than "regular," and were minimal rather than "considerable." We therefore conclude that petitioner was "not engaged in trade or business in the United States" during the taxable years within the meaning of article IX(1) of the United States-United Kingdom tax convention.

In the *Herbert* case the property was acquired by the taxpayer by gift and there were no rental activities in the taxable period, while here Amodio purchased two properties for income-producing pur-

poses, his agents collected rents, paid taxes, insurance, and management fees, arranged leases, and provided for repairs.

Amodio purchased the Ross Avenue property in 1950 for a price of $48,000. He arranged with his agent to look at other real properties for investment and as a result he acquired the Greenville Avenue property at the end of 1951 for a price of $90,000. The gross annual rentals in 1951 were $6,000, in 1952 and 1953 were in excess of $16,000, and were over $12,000 in 1954. The properties were managed by local real estate agents who negotiated or renewed leases, arranged for repairs, collected rents, paid taxes and assessments, and remitted net proceeds to Fidelity after deducting commissions. From the proceeds Fidelity or the local agent paid principal and interest on the mortgages, insurance premiums, and taxes. Fidelity retained its commissions and amounts to be applied on Amodio's income taxes and the remainder was sent to him. The acts of the agents are attributable to Amodio. These activities were beyond the scope of mere ownership of property and the receipt of income. They were considerable, continuous, and regular, as in the *Lewenhaupt* case. Such activities of a nonresident alien through his agents in the United States constitute engaging in business in the United States. Amodio is taxable as a nonresident alien engaged in trade or business in the United States.

In view of this conclusion it is not necessary to determine whether Amodio is also engaged in business in the United States through his interest in the properties owned by the Amodio trust.

The issue whether Amodio is taxable on capital gains from sales of assets outside the Amodio trust depends upon whether he was engaged in trade or business in the United States. Since he was so engaged in business he is taxable on such gains. Section 211(a) of the 1939 Code and section 871(a) of the 1954 Code, which except such gains of nonresident aliens under certain conditions, are not applicable here.

Amodio further contends that under the convention he was subject to tax on dividend and interest income at rates no greater than 15 per cent and 5 per cent respectively, as provided in articles VI and VII of the convention. The respondent contends (1) that Amodio is not a resident of Switzerland and therefore the convention does not apply, and (2) that if it does apply, Amodio had a "permanent establishment" in the United States and therefore articles VI and VII are not applicable to him.

The respondent's argument that Amodio is not a resident of Switzerland is stated as follows:

The United States–Switzerland Tax Convention called for an exchange of certain fiscal information between these countries. The Swiss authorities were

informed that United States banks—Brown Brothers and Harriman of New York and Fidelity Trust of Pittsburgh—had withheld 15% and 5% on dividends and interest, respectively, and that the net amounts after withholding were transmitted to Amodio in care of a Swiss bank—Ferrier, Lullin & Cie of Geneva, Switzerland. The American banks withheld 15% and 5% on the theory that Amodio was domiciled in Switzerland and therefore subject to the United States–Switzerland Convention. The Swiss authorities were requested to inquire of Amodio whether he was *in fact* domiciled in Switzerland, and if not then the Swiss authorities were to withhold an additional 15% and 25% on dividends and interest, respectively, since Amodio would have been erroneously claiming the benefits of the United States–Switzerland Convention. Amodio was informed that if he was actually domiciled in a country other than Switzerland he was to pay additional withholding on income from dividends and interest. Amodio's reaction to this communication from the Swiss authorities was to pay the additional withholdings. It is apparent therefore he made representations to Swiss authorities that he was not seeking the benefits of the United States–Switzerland Convention and *was not* domiciled in Switzerland.

The respondent refers to a letter to Amodio dated June 18, 1954, by the Swiss Federal Administration, which is translated as follows:

According to information from American fiscal authorities you have received from the United States through the Fidelity Trust Company in 1951, $22,189.89.

You have claimed the benefits of the Switzerland–United States Convention with respect to the reduced "withholding tax" and therefore we must ask you to let us know your permanent domicile with your exact address.

If you have other than a Swiss domicile we ask you to let us also know. In such a case we will inform the American fiscal authorities that you are not governed by the Switzerland–United States Tax Convention and consequently you are not entitled to the reduction of the "withholding tax". This will not be necessary if you will deposit with us for the account of the American fiscal authorities the sum of the reduction of the tax (15% on dividends and 25% on interest). If such should be the case, you must send us at the same time filled out the enclosed Form S–182. The conversion into Swiss Francs is to be made according to the New York market as of the date you pay.

Amodio testified that he has been domiciled in Switzerland since 1948 and intends to remain domiciled there. He testified that he paid the Swiss administration the amounts claimed in the correspondence, and it appears that he did so under the impression he had no choice but to pay. At any rate he is now claiming the benefits of the convention with respect to his income from United States sources. We have no doubt that he was a resident of Switzerland in the taxable years.

Under articles VI and VII of the convention the tax on dividends and interest derived from sources in the United States by a nonresident alien who is a resident of Switzerland shall not exceed 15

per cent and 5 per cent respectively, if such alien has no permanent establishment in the United States.[6]

The respondent argues that Amodio had a permanent establishment in the United States, consisting of the real properties he owned or those of which he was the coowner through the Amodio trust.

The convention and regulations implementing it define "permanent establishment"[7] as meaning an office, factory, workshop, or other fixed place of business, and as implying the active conduct of a "business enterprise."

In *Consolidated Premium Iron Ores Ltd.*, 28 T.C. 127 (1957), we expressed the view (p. 152) that "permanent establishment" implies the existence of an office, staffed and capable of carrying on business from day to day, or a plant or facilities equipped to carry on the ordinary routine of a business activity.

---

[6] ARTICLE VI

(1) The rate of tax imposed by one of the contracting States upon dividends derived from sources within such State by a resident or corporation or other entity of the other contracting State not having a permanent establishment in the former State shall not exceed 15 percent: * * *

ARTICLE VII

(1) The rate of tax imposed by one of the contracting States on interest on bonds, securities, notes, debentures or on any other form of indebtedness (including mortgages or bonds secured by real property) derived from sources within such contracting State by a resident or corporation or other entity of the other contracting State not having a permanent establishment in the former State shall not exceed five percent: * * *

[7] Sec. 509.104 DEFINITIONS— * * *

(b) *Specific terms.*—As used in this Treasury decision—

* * * * * *

(5) *Permanent establishment*—(1) *Fixed place of business.*—The term "permanent establishment" means an office, factory, workshop, warehouse, branch, or other fixed place of business, but does not include the casual and temporary use of merely storage facilities. It implies the active conduct of a business enterprise. The mere ownership, for example, of timberlands or a warehouse in the United States by a Swiss enterprise does not mean that such enterprise, in the absence of any business activity therein, has a permanent establishment in the United States. Moreover, the maintenance within the United States by a Swiss enterprise of a warehouse for convenience of delivery, and not for purposes of display, does not of itself constitute a permanent establishment in the United States, even though offers of purchase have been obtained by an agent therein of the Swiss enterprise and transmitted by him to the Swiss enterprise for acceptance. The fact that a Swiss enterprise maintains in the United States an office or other fixed place of business used exclusively for the purchase for such enterprise of goods or merchandise shall not of itself constitute such fixed place of business a permanent establishment of such enterprise.

* * * * * * *

(iii) *Agency.*—A Swiss enterprise which has an agency in the United States does not thereby have a permanent establishment in the United States, unless the agent has, and habitually exercises, a general authority to negotiate and conclude contracts on behalf of such enterprise or unless he has a stock of merchandise from which he regularly fills orders on its behalf. If the enterprise has an agent in the United States who has power to contract on its behalf, but only at fixed prices and under conditions determined by such principal, it does not thereby necessarily have a permanent establishment in the United States. * * * A Swiss enterprise shall not be deemed to have a permanent establishment in the United States merely because it carries on business dealings in the United States through a commission agent, broker, custodian, or other independent agent, acting in the ordinary course of his business as such.

In our opinion the real properties owned by Amodio or of which he was a coowner through the trust cannot be regarded as a "permanent establishment" within the meaning of the convention. Nor can it be said that his agents managing these properties represent a permanent establishment for this purpose, even though we have concluded that Amodio was doing business through such agents. The convention indicates, in article II(1)(c),[8] that carrying on business dealings through a broker or independent agent acting in the ordinary course of his business as such does not amount to having a permanent establishment. Amodio's agents fall within this description. Accordingly, the tax upon Amodio's dividend and interest income from United States sources is limited to the rates stated in the convention.

Amodio contends further that his liability for income taxes to the United States has been discharged through amounts withheld by agents and additional amounts collected from him by the Swiss Federal Tax Administration and remitted to the United States Treasury on his account. He alleges that his taxes have been overpaid and that he is entitled to refunds and is not liable for deficiencies. The respondent states that there is no evidence that any of the amounts allegedly collected by Swiss fiscal authorities were ever paid over to the United States Treasury, but that an investigation is being made concerning this and credit will be given if such payments have been received.

The liability of Amodio will be subject to recomputation under Rule 50 of this Court as a result of our decisions upon the issues. Any credits available to Amodio may be applied to this liability and if the taxes have been overpaid the amount of the overpayments refundable, subject to the applicable statutes of limitation, can be determined.

*Decision will be entered for the respondent in Docket No. 74211.*

*Decision will be entered under Rule 50 in Docket No. 74297.*

---

[8]                                      ARTICLE II

(1) As used in this convention:

  *        *        *        *        *        *        *

(c) The term "permanent establishment" means a branch, office, factory, workshop, warehouse or other fixed place of business, but does not include the casual and temporary use of merely storage facilities, nor does it include an agency unless the agent has and habitually exercises a general authority to negotiate and conclude contracts on behalf of an enterprise or has a stock of merchandise from which he regularly fills orders on its behalf. An enterprise of one of the contracting States shall not be deemed to have a permanent establishment in the other State merely because it carries on business dealings in such other State through a commission agent, broker or custodian or other independent agent acting in the ordinary course of his business as such. * * *