108 T.C. No. 27


UNITED STATES TAX COURT


TAIYO HAWAII COMPANY, LTD., Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 10159-95.                    Filed June 25, 1997.


        P, a foreign corporation wholly owned by a foreign
conglomerate, was engaged in real estate activity in
Hawaii.  P borrowed funds from foreign banks and also
received advances from its parent and a related foreign
corporation.  Interest on bank borrowing was paid, and
interest on advances from related corporations was
accrued and not paid.  P reported the interest as
deductible.  After an audit examination, respondent
determined that the accrued but unpaid interest was
subject to the excess interest tax provided for in sec.
884, I.R.C.  P, although reporting the advances from
related corporations as debt, now claims that they
were, in substance, equity.  P also contends that the
accrued and unpaid interest is not deductible due to
sec. 267, I.R.C., and therefore sec. 884 should not
apply.  Finally, if it is concluded that sec. 884
applies, P argues that certain of its property did not
qualify as part of the base for computing the excess
interest tax.

Held:  The advances were debt, and P is subject to the sec. 884 excess interest tax provisions.  Held, further, sec. 884 and regulations interpreted--excess interest tax provisions apply.  Held, further, the questioned assets are includable in the excess interest tax computation.


Michael Rosenthal and Thomas E. Busch, for petitioner.

Jonathan J. Ono, for respondent.


GERBER, Judge:  For the taxable years ended September 30, 1989, 1990, and 1991,[1] respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $35,529, $71,692, and $84,331, respectively.  Respondent also determined an $8,433 addition to tax under section 6651(a)(1)[2] for 1991.

The issues for our consideration are:  (1) Whether petitioner is liable for excess interest tax under section 884(f)(1)(B) for 1989, 1990, and 1991; (2) if petitioner is liable for the excess interest tax, whether certain assets should be included in the taxable base; and (3) whether petitioner is liable under section 6651(a)(1) for failure to timely file a return for 1991.

---

[1]  All taxable years shown in this opinion, although expressed simply as years, refer to taxable years ended Sept. 30 of the referenced year.

[2]  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the period under consideration.  Rule references are to this Court's Rules of Practice and Procedure.

FINDINGS OF FACT[3]

At the time its petition was filed, petitioner, Taiyo Hawaii Co., Ltd. (Taiyo Hawaii), had its principal place of business in Honolulu, Hawaii. Petitioner was a Japanese corporation engaged in real estate activity in Hawaii. Petitioner was incorporated on October 30, 1985, with its outstanding capital stock held by Taiyo Fudosan Kogyo Co. (Fudosan), a Japanese corporation. Pursuant to an October 31, 1985, merger agreement, Fudosan transferred its Hawaiian assets to petitioner and its Japanese assets to another related company.

Fudosan and another Japanese corporation were merged into the Seiyo Corp. (Seiyo), a Japanese corporation, as of January 1, 1986. As part of the merger, Seiyo acquired (and retained throughout the years in issue) petitioner's issued and outstanding capital stock. Seiyo was part of the real estate and tourism group of a Japanese conglomerate, Seibu Saison Group.

On October 1, 1988, petitioner's assets included: Cash; certain receivables; a condominium in Waikiki, Hawaii; a 50-percent interest in a Hawaiian partnership, T-3 Wailea Joint Venture; and certain unimproved real property on the island of Hawaii. The Hawaiian realty had been held by petitioner since 1986, having been acquired by Fudosan between 1973 and 1980. One

---

[3] The parties' stipulation of facts and the attached exhibits are incorporated by this reference.

portion of the realty was known as the "Ginter Property" and the other as the "Gomes Property".

Petitioner initially continued Fudosan's lead and sought to develop the realty. An architect was retained to prepare development plans that were submitted to the local county planning commission responsible for land development. Petitioner proposed that the Ginter property, which was zoned for single-family residences, be subdivided into 7,500- and 15,000-square-foot residential lots with houses. Subsequently, petitioner commissioned a feasibility study concerning development of a 9- or 18-hole golf course in proximity with the Ginter subdivision. Petitioner sought to develop the Gomes property into approximately 300 subdivided residential units and a botanical garden.

Prior to the taxable years before the Court, petitioner encountered significant impediments that ultimately proved fatal to its development plans. On several occasions, the County of Hawaii proposed the construction of a major highway through the Ginter property, which would have provided the necessary access for development. The proposed highway was never constructed. Also, the Gomes property was located in a flood plain, and substantial drainage work would have been required prior to further development. Petitioner determined that the cost (several millions of dollars) to improve the Ginter and Gomes

properties was too large to warrant development. Petitioner did not receive any revenue from either the Gomes or Ginter properties during the years at issue. Petitioner did not advertise the properties for sale, and no bona fide purchase offers were received until 1995.

On May 2, 1995, an unrelated company, Towne Development of Hawaii, Inc., made an offer to purchase and did eventually purchase the Ginter and Gomes properties. The purchase price was to be approximately $3 million. A possible cloud on the title, however, caused the price to be reduced to $2.4 million.

With respect to the joint venture, T-3 Wailea partnership, petitioner owned a 50-percent interest and was also the managing partner. The joint venture owned approximately 600 acres of land immediately above Wailea, Hawaii. In 1990, petitioner liquidated its interest in the T-3 Wailea partnership in exchange for a $5,963,431 distribution, resulting in a $2,450,722 profit.

Sometime in 1990, petitioner acquired a 50-percent interest in Pines Plaza Associates, a Hawaiian general partnership engaged in real property construction. Petitioner utilized certain portions of advances from Seiyo and Taiyo Development Co. (Taiyo Development) to develop the Pines Plaza project.

Petitioner obtained financing from unrelated financial institutions including Mitsubishi Trust & Banking (Mitsubishi Trust), Bank of Tokyo, and Dai-Ichi Bank in order to conduct its

real property business activity in Hawaii.  Petitioner also received advances from its parent corporation, Seiyo, as well as another related company, Taiyo Development, a Japanese corporation.  The advances received from Seiyo and Taiyo Development were reflected on petitioner's books, records, and tax returns as payables to affiliates.  These advances were utilized for working capital to develop projects, to pay outstanding debts owed to financial institutions, and to exploit, maintain, and hold the Ginter and Gomes properties.

During the taxable year 1988, Taiyo Development made advances to petitioner which were not evidenced by promissory notes or other written instruments.  Although the records in which the 1988 advances were shown did not expressly reflect a stated rate of interest, Seiyo had instructed petitioner to accrue interest at a certain rate on its books.

At the end of the 1988, 1989, 1990, and 1991 fiscal years, petitioner had outstanding bank loans with third-party banks, in the aggregate amounts of $12,722,465, $15,440,132, $13,479,595, and $5,548,809, respectively.  During the period under consideration, petitioner paid down several of the loans due to third-party banks.  The loans were evidenced by promissory notes executed by petitioner.

During the taxable years 1989, 1990, and 1991, Seiyo and Taiyo Development advanced the following amounts to petitioner:

| Year | Seiyo | Taiyo Development |
|------|-------|-------------------|
| 1989 | $5,000,000 | $3,604,746 |
| 1990 | 191,755 | --- |
| 1991 | 2,194,378 | --- |

The advances were not evidenced by promissory notes, had no fixed maturity date, and were unsecured. The advances were not repaid during the years in issue. During the years 1993 and 1994, petitioner repaid approximately $5 million and $400,000 of the related party debt, respectively. There was no stated rate of interest, and no interest was paid by petitioner on the advances. Seiyo and Taiyo Development did not demand payment or take legal action against petitioner regarding the advances.

At the end of the 1990 and 1991 fiscal years, petitioner's outstanding liabilities (including advances from Seiyo and Taiyo Development, bank indebtedness, and miscellaneous liabilities) and the tax basis of its assets were as follows:

| Fiscal Year Ended Sept. 30 | Outstanding Total Liabilities | Tax Basis of Assets |
|------|-------|-------|
| 1990 | $27,680,245 | $20,858,967 |
| 1991 | 21,955,602 | 16,907,976 |

As of September 30, 1995, the outstanding advances (including principal and accrued interest) totaled $23,875,036.82.

On its Federal income tax returns, petitioner generally reported that it was engaged in real estate development and property investment and real estate investment and development. On its 1989, 1990, and 1991 tax returns, petitioner reported

"Land Development Costs" of $13,800,857, $13,830,400, and $11,481,780, respectively.

Petitioner, on originally filed returns, claimed the following amounts of interest as deductions related to its effectively connected income (ECI) from the conduct of a trade or business in the United States:

| Fiscal Year Ended | Interest Deducted |
| --- | --- |
| 9/30/89 | $887,324 |
| 9/30/90 | 1,837,751 |
| 9/30/91 | 1,346,795 |

On its original income tax returns for the taxable years 1989 through 1991, petitioner reported that it had no excess interest tax liability by means of the following reported information:

| Fiscal Year Ended | Excess Interest Computed |
| --- | --- |
| 9/30/89 | Designated as N/A |
| 9/30/90 | $1,837,751 - $1,837,751 = None |
| 9/30/91 | $1,346,795 - $1,346,795 = None |

Petitioner, for the years 1989 through 1991, withheld and paid tax to respondent in an amount equivalent to 10 percent of the interest paid to third-party foreign banks (Mitsubishi Trust and Bank of Tokyo), in accordance with the applicable 10-percent withholding rate under the United States-Japan Income Tax Treaty (the treaty) as follows:

| Fiscal Year Ended Sept. 30 | Interest Paid | Tax Withheld |
|---|---|---|
| 1989 | $838,037.66 | $83,803.77 |
| 1990 | 1,451,660.54 | 145,166.06 |
| 1991 | 941,821.13 | 94,182.11 |

On or about June 14, 1995, petitioner filed amended 1989, 1990, and 1991 Federal income tax returns. On the amended returns, petitioner claimed deductions for interest expense related to its ECI from the conduct of a trade or business in the United States, as follows:

| Fiscal Year Ended Sept. 30 | Interest Deducted |
|---|---|
| 1989 | $834,750 |
| 1990 | 1,307,734 |
| 1991 | 1,348,414 |

On amended returns, petitioner reported the sum of its assets and liabilities, as follows:

| Fiscal Year Ended Sept. 30 | Net Liabilities Over Assets[1] |
|---|---|
| 1989 | ($8,211,833) |
| 1990 | (8,917,909) |
| 1991 | (7,143,782) |

[1]These amounts were derived from Schedule L of petitioner's amended Federal income tax returns.

Petitioner's amended returns for 1989, 1990, and 1991, reflected its net income or loss (prior to the deduction for interest expense) and gain or loss on its ECI, without considering net operating loss deductions, as follows:

| Fiscal Year Ended Sept. 30 | Net Income or (Loss) Prior to Interest Deduction[1] | Gain or (Loss) on ECI |
|---|---|---|
| 1989 | ($5,088,223) | ($5,922,973) |
| 1990 | 1,201,048 | (106,686) |
| 1991 | 4,025,081 | 2,676,667 |

[1]Petitioner, on its first and second amended 1989 returns, reported the same net loss, prior to the deduction for interest expense, as had been reported on its original 1989 return.

In connection with the amended returns, petitioner filed a statement entitled "Elections under Treasury Regulation Section 1.884-1(i) and 1.884-4(e)" seeking to reduce its liabilities and interest expenses, as follows:

| Fiscal Year Ended | Liability Reduction | Interest Expense Reduction |
|---|---|---|
| 9/30/89 | $8,585,294 | $355,292 |
| 9/30/90 | 10,669,677 | 716,924 |
| 9/30/91 | 8,447,873 | 843,312 |

Precipitated by respondent's audit examination, petitioner's accountant, Kent K. Tsukamoto (Tsukamoto), a certified public accountant, requested that the Seiyo office in Japan provide copies of promissory notes for the 1988 through 1991 advances. The employees of Seiyo initially did not understand why Tsukamoto requested copies of promissory notes evidencing the advances as loans. Ultimately, Tsukamoto received a Japanese language document from Seiyo along with an English translation, entitled "Confirmation/Acknowledgment". The document was dated June 2, 1993, and signed by the presidents of Seiyo and petitioner. It

reflects petitioner as the borrower and Seiyo as the lender, as

follows:

| Loan Date | Loan Amount (Yen) | Interest Rate | Conditions |
|---|---|---|---|
| 7/31/86 | 50,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 8/30/86 | 52,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 11/29/86 | 20,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 12/31/86 | 13,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 3/31/87 | 32,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 6/30/87 | 30,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 9/30/87 | 29,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 12/31/87 | 27,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 3/31/88 | 158,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 6/30/88 | 28,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 9/30/88 | 27,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 12/31/88 | 27,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 3/31/89 | 28,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 5/31/89 | 400,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 6/30/89 | 31,000,000 | Short-term prime rate of payment | Payment of principal is the priority |
| 9/29/89 | 21,000,000 | Short-term prime rate of payment | Payment of principal is the priority |

Tsukamoto was not aware of some of the advances listed in the

aforementioned document.  No copies of individual promissory

notes evidencing the advances were received.

On September 30, 1995, petitioner's balance sheet reflected

an outstanding loan of $18,018,708.85, as well as accrued

interest of $5,856,327.97, shown as payable to Seiyo.  Patrick

Kubota (Kubota), petitioner's treasurer and project manager from

1986 through 1994, was responsible for petitioner's accounting

and financial records. Kubota was one of four individuals who operated and managed petitioner. He worked with Michio Ito, a representative of Seiyo who supervised petitioner's Hawaiian operation. Seiyo, through Ito, instructed Kubota with regard to the advances, to accrue certain interest amounts on petitioner's books and records.

Kubota had difficulty differentiating petitioner's real estate development from its real estate investment activity. Overall, Kubota believed that petitioner would not have had sufficient funds to pay its bank debt and develop its properties, as well as maintain and hold the Ginter and Gomes properties, if it had not obtained the advances from Seiyo. Kubota also believed that petitioner was willing, at any point, to sell the Ginter and Gomes properties provided that a bona fide offer was received. Kubota thought that the advances from Seiyo and Taiyo Development to petitioner were not considered a priority item for repayment.

Petitioner's accountant, Tsukamoto, included the advances from Seiyo and Taiyo Development as liabilities on Schedule L of petitioner's Federal income tax returns. In Tsukamoto's professional judgment petitioner did not have the financial ability to pay interest and amortize principal on the advances. The advances to petitioner from Seiyo and Taiyo Development enabled it to make payments on principal and interest to third-

party banks. Without the advances, petitioner would not have been able to conduct its real estate development activities as well as maintaining and holding the Ginter and Gomes properties from 1988 through 1991.

Petitioner did not elect under section 882(d) to treat any of its income from real estate activity as effectively connected with a U.S. trade or business.

OPINION

The primary controversy concerns whether petitioner is liable for the excess interest tax pursuant to section 884(f)(1)(B).[4] Section 884, here considered by this Court for the first time, was enacted to create parity between foreign corporations that choose to operate in branch form and those that choose to operate through a domestic subsidiary in the United States.[5] See H. Conf. Rept. 99-841 (Vol. II), at II-646 to II-647 (1986), 1986-3 C.B. (Vol. 4) 1, 647-648; Staff of Joint Comm.

---

[4] This subsection is part of the statutory provisions referred to as the branch tax regime.

[5] Although included in subsec. (f) of sec. 884, the branch tax regime is a self-contained group of provisions intended to achieve parity between branch operations and domestic subsidiaries of foreign corporations. The application of these provisions is complicated due to their complexity, lack of specific definitions, and reliance on Internal Revenue Code concepts that do not necessarily comport with the sec. 884 structure. Artificial bases are used to reach parity, and certain distinctions made in other portions of income taxation are ignored for purposes of the branch tax laws. These attributes have made our analysis more difficult.

on Taxation, General Explanation of the Tax Reform Act of 1986, at 1037 (J. Comm. Print 1987). To achieve that result, three distinct taxes may be imposed.[6] Section 884(a) imposes a tax on earnings of a U.S. trade or business deemed to be repatriated by a foreign corporation. Section 884(f)(1)(A) treats certain interest paid by the U.S. trade or business of a foreign corporation (referred to as branch interest) as if it were paid by a domestic corporation. This is accomplished by subjecting the interest to withholding under sections 881(a) and 1442, as if it were U.S.-source income paid to a foreign person or entity. Finally, section 884(f)(1)(B) imposes a tax on excess interest to the extent the interest deduction allocable to the U.S. trade or business in computing its taxable ECI (as provided for in section 1.882-5, Income Tax Regs.) exceeds the branch interest of section 884(f)(1)(A). The excess interest is treated as if it were paid to the foreign corporation by a wholly owned domestic corporation

---

[6] The three taxes to achieve parity are in addition to any tax under sec. 882(a) on income of a foreign corporation engaged in a trade or business within the United States that is effectively connected with the conduct of the trade or business in the United States.

"Effectively connected income" (ECI) is a term of art defined in sec. 864(c). ECI includes certain types of foreign source income earned by a foreign corporation. Sec. 882 allows certain deductions and credits for ECI, and the net income is subject to tax.

Conversely, income that is not effectively connected with the conduct of a trade or business in the United States is subject to U.S. taxation at a flat rate of 30 percent unless a different amount is provided for in an income tax treaty. Sec. 881.

on the last day of the foreign corporation's taxable year and subject to tax under section 881(a) (the excess interest tax). The controversy here concerns the excess interest provisions.

The excess interest tax ties in with the withholding provisions of section 884(f)(1)(A). The withholding on interest paid to foreign persons or entities is a means of collecting tax on the interest recipient, whereas the excess interest tax of section 884(f)(1)(B) is imposed on the foreign branch payor. The interest deduction allocable to the branch is determined by a formula provided in section 1.882-5, Income Tax Regs., and is an apportionable amount of ECI, which is used as the base. The amount of interest deductible for purposes of the branch tax law is therefore derived in a theoretical fashion[7] to complete the statutory configuration designed to achieve parity between a foreign branch and a domestic subsidiary of a foreign parent.

Here, petitioner, a Japanese corporation wholly owned by another Japanese corporation, obtained funding from unrelated banks and also from related corporations (its parent and another related corporation). Petitioner paid interest on the loans from unrelated banks. Also, petitioner accrued interest without making any payments on the funds obtained from the affiliated

---

[7] The amount derived is not necessarily equivalent to the amount of interest actually paid or accrued. Instead, the deductible amount of interest pursuant to sec. 1.882-5, Income Tax Regs., is an amount prescribed to achieve parity.

companies.  On its Forms 1120F, U.S. Income Tax Return of a Foreign Corporation, petitioner reported interest paid by a U.S. trade or business (branch interest) under section 884(f)(1)(A) to include the accrued amounts in connection with the funding from related foreign sources.  Petitioner did not withhold any amount under sections 884(f)(1)(A) and 1442 with respect to the accrued interest but did withhold with respect to the interest paid to the unrelated banks.  Respondent, following the audit examination of petitioner, determined that the accrued interest to related entities did not qualify as branch interest and, instead, constituted excess interest within the meaning of section 884(f)(1)(B).

After respondent determined that there was an excess interest tax liability, petitioner attempted to fashion a solution for relief that would also avoid any additional tax to petitioner or its parent.  The branch tax law contains various provisions designed to permit alternatives to the tax under section 884 and to enable a taxpayer to choose which provision of that section applies.  The "relief" provisions include elections that, for example, would permit shifting the tax burden from section 884 to section 882(e) as ECI or from excess interest tax to branch interest withholding (section 884(f)(1)(B) to (A)).  None of the approaches provide the tax relief that petitioner seeks.  Petitioner has also proposed several alternative

approaches under which it is seeking both to avoid the excess interest tax under section 884(f)(1)(B) and, in the process, to avoid bearing the tax burden of another provision of the branch profit tax regime.

In that connection, petitioner did not make an election under section 1.884-4T(b)(7), Temporary Income Tax Regs. (finalized in 1992 as sec. 1.884-4(c)(1), Income Tax Regs.), 53 Fed. Reg. 34054 (Sept. 2, 1988), to treat the accrued interest as paid in the year of accrual, thereby relieving itself of the potential for excess interest tax liability.[8]  The election by a foreign corporation must be made with its income tax return, its amended income tax return, or a separate written notice to the Commissioner of Internal Revenue, none of which was done in this case.  See sec. 1.884-4T(b)(7)(iii), Temporary Income Tax Regs., supra (finalized as sec. 1.884-4(c)(1)(iii), Income Tax Regs.).

After respondent's audit began, petitioner filed amended Forms 1120F for the years under consideration seeking to eliminate any excess interest by attempting an election to reduce the affected liabilities under section 1.884-1(e)(3), Income Tax Regs.  Finally, after filing the petition in this case,

---

[8]  If petitioner had made that election, it would have been binding for all years, and petitioner would then have been subject to a 10-percent withholding obligation under art. 13 of the U.S.-Japan Income Tax Treaty (the treaty).  Convention for the Avoidance of Double Taxation, Mar. 8, 1971, U.S.-Japan, art. 13, 23 U.S.T. (Part I) 967, 990.  Under the treaty, the withholding under sec. 1442 is reduced from 30 to 10 percent.

petitioner posed two additional alternative arguments in support of its allegation that respondent's excess interest tax determination is in error. Petitioner contends that the advances from related entities were equity rather than debt and, as a second alternative, that section 267(a)(3) prevents the application of the excess interest tax because the deduction for its interest obligations to the related entities is prohibited. If we do not accept petitioner's primary arguments, petitioner also argues that: (1) Generally, the excess interest tax violates the nondiscrimination clause of the treaty, and/or (2) certain properties held by petitioner were not U.S. trade or business assets for purposes of calculating the excess interest tax.

Debt vs. Equity--We first address petitioner's contention that the advances in question were equity rather than debt. Petitioner, taking the position ordinarily advanced by respondent, argues that there is no deductible interest based on statutory (section 385) and case law concerning the debt versus equity issue. If the advances are not debt for Federal income tax purposes, as petitioner contends, there could be no deductible interest expense on the advances and no liability for the excess interest tax imposed by section 884(f)(1)(B). Conversely, respondent argues that the debt versus equity issue should be decided in favor of debt, rather than equity.

Respondent, however, raises the threshold question of whether petitioner should be allowed to disavow the form of the transaction, which was cast as debt.  In this regard, respondent agrees that if we find the advances were equity (and not debt), the matter would be resolved in petitioner's favor.  Petitioner bears the burden of proof.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  If we find that the transaction was cast as debt, then it would be more difficult for petitioner to disavow the form and successfully show that the advances were equity in substance.

Respondent contends that, prior to the audit, petitioner treated the advances for financial purposes and tax reporting as loans or debt.  Petitioner counters that, irrespective of the labels originally attached to the advances, they were, in substance, capital contributions.  Petitioner argues that it is entitled to disavow the form of its transaction.[9]

Taxpayers are free to structure their transactions in a manner that will result in their owing the least amount of tax possible.  However, the Supreme Court observed in Commissioner v.

---

[9]  In support of its argument, petitioner, cites J.A. Tobin Constr. Co. v. Commissioner, 85 T.C. 1005 (1985); Georgia-Pac. Corp. v. Commissioner, 63 T.C. 790 (1975); J.A. Maurer, Inc. v. Commissioner, 30 T.C. 1273 (1958); LDS, Inc. v. Commissioner, T.C. Memo. 1986-293; Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985).

National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974):

> that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so he must accept the tax consequences of his choice, whether contemplated or not, * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not. [Citations omitted.]

See also Television Indus., Inc. v. Commissioner, 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959).

Taxpayers have, however, been permitted to assert substance over form in situations where their "tax reporting and other actions have shown an honest and consistent respect for * * * the substance of * * * [a transaction]". FNMA v. Commissioner, 90 T.C. 405, 426 (1988) (citing Illinois Power Co. v. Commissioner, 87 T.C. 1417, 1430 (1986)), affd. 896 F.2d 580 (D.C. Cir. 1990).

Petitioner has, for all purposes, treated the advances as loans and was instructed by its parent corporation to accrue interest. Under those circumstances, we reject petitioner's approach of testing its own choice of form with traditional debt versus equity considerations, such as the absence of a fixed payment schedule, maturity dates, enforcement, or formal debt instruments.[10] We are likewise unpersuaded by petitioner's

---

[10] Petitioner, for example, relies on the following line of cases. Hardman v. United States, 827 F.2d 1409 (9th Cir. 1987); Fin Hay Realty Co. v. United States, 398 F.2d 694 (3d Cir. 1968); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476 (1980); Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441; Green Leaf
(continued...)

accountant's (Tsukamoto's) after-the-fact testimony that, in retrospect, he should have considered the advances as equity and reported them as such on petitioner's tax returns.

Petitioner's approach does not show that the substance of the advances was not loans.  It merely illustrates that the parties to the transactions did not follow all of the formalities that might be considered probative that the advances were debt rather than equity.  In that regard, petitioner has not shown that the form of the transaction did not comport with its substance.  We must take into consideration here the fact that both petitioner and its parent were corporations formed under the laws of Japan and that they are foreign entities conducting business in the United States.  Additionally, when the "home office" (foreign parent corporation's office) was asked for evidence of the indebtedness, it provided a foreign language document, which was translated to reflect the title "Confirmation/Acknowledgment" and contained a list of advances and dates made.  With respect to each advance, the document indicates that "Payment of principal is the priority" and that the rate of payment is "Short-term prime".  These descriptive terms are indicative of debt and interest rather than equity or capital.

---

[10](...continued)
Ventures, Inc. v. Commissioner, T.C. Memo. 1995-155.

Accordingly, we hold that petitioner has not carried its burden of showing that the substance of the transaction was different from its form. Elrod v. Commissioner, 87 T.C. 1046, 1066 (1986); Pritchett v. Commissioner, 63 T.C. 149, 171 (1974) (citing Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957)); Estate of Durkin v. Commissioner, T.C. Memo. 1992-325, supplemented by 99 T.C. 561, 572 (1992); see also Estate of Corbett v. Commissioner, T.C. Memo. 1996-255.

Consistent with our holding, the Court of Appeals for the Ninth Circuit (the circuit in which this case would be appealable) has held, in certain instances, that taxpayers may not cast a transaction in one form, file returns consistent with that form, and then argue for an alternative tax treatment after their returns are audited. See Investors Ins. Agency, Inc. v. Commissioner, 677 F.2d 1328, 1330 (9th Cir. 1982), affg. 72 T.C. 1027 (1979); McManus v. Commissioner, 583 F.2d 443, 447 (9th Cir. 1978) ("A taxpayer is estopped from later denying the status he claimed on his tax returns."), affg. 65 T.C. 197 (1975); Parkside, Inc. v. Commissioner, 571 F.2d 1092 (9th Cir. 1977), revg. T.C. Memo. 1975-14; In re Steen, 509 F.2d 1398, 1402-1403 n.4 (9th Cir. 1975); Demirjian v. Commissioner, 457 F.2d 1, 5 n.19 (3d Cir. 1972), affg. 54 T.C. 1691 (1970).

In its tax and financial reporting and other actions, petitioner has not demonstrated an honest and consistent respect

for what it now contends was the substance of the transaction. Comdisco, Inc. v. United States, 756 F.2d 569, 578 (7th Cir. 1985); Estate of Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), revg. and remanding 31 T.C. 918 (1959); FNMA v. Commissioner, supra at 426.

Having decided that petitioner is bound by the form of the transaction and that, for purposes of section 884, the advances in issue were debt as opposed to equity, we now consider petitioner's alternate arguments. Because the accrued interest has not been paid to the related party, petitioner contends that section 267 prevents its deduction. Petitioner argues that interest must be deductible for the excess interest tax to apply.

Petitioner's Proposed Deductibility Requirement--Section 267(a)(2) generally limits the deductibility of interest by the payor until it is included in the related payee's gross income. Section 267(a)(3) empowers the Secretary to promulgate regulations to apply the matching provisions of section 267(a)(2) to include instances where the payee is a foreign person (entity). In particular, petitioner relies on section 1.267(a)-3(b)(1), Income Tax Regs.[11] Petitioner argues that section

---

[11] Petitioner acknowledges and we note that the regulation relied upon was published Dec. 31, 1992, in T.D. 8465, 1993-1 C.B. 28, a date subsequent to the years under consideration. Petitioner, however, points out that the Commissioner had published the essence of that interpretation in Notice 89-84, 1989-2 C.B. 402, for taxable years beginning after Dec. 31, 1983.

884(f)(1)(B) does not authorize the deduction of interest; it merely provides the extent to which interest is allowable as a deduction in the section 882 computation of ECI. Petitioner theorizes that we must look to section 163 for the deduction, and in turn, the section 267 limitations would then apply.

Respondent does not comment about or analyze whether petitioner's section 267 argument is correct.[12]  Instead, respondent argues that petitioner's proposed deductibility requirement is irrelevant because section 884 applies even if the interest is not deductible.

The excess interest tax statutory language, in its present form, does not support petitioner's position that deductibility of interest on debt to related creditors is a prerequisite to the application of the excess interest tax.  Section 884(f)(1), as enacted in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1241, 100 Stat. 2085, 2579, and amended by the Small Business Job Protection Act of 1996 (1996 Act), Pub. L. 104-188, sec. 1704(f)(3), 110 Stat. 1755, 1879, provides:

> SEC. 884(f).  Treatment of Interest Allocable to Effectively Connected Income.--
>
> (1) In general.--In the case of a foreign corporation engaged in a trade or business in the United States (or

---

[12]  We do not decide here whether sec. 267 is applicable under the circumstances found in this case.  Due to our ultimate conclusion, it is unnecessary to decide which, if any, limitation may have existed with regard to the deductibility of the interest in question.

having gross income treated as effectively connected with the conduct of a trade or business in the United States), for purposes of this subtitle--

(A) any interest paid by such trade or business in the United States shall be treated as if it were paid by a domestic corporation, and

(B) ~~to the extent the amount of interest allowable as a deduction under section 882 in computing the effectively connected taxable income of such foreign corporation exceeds the interest described in subparagraph (A)~~<u>to the extent that the allocable interest exceeds the interest described in subparagraph (A)</u>, such foreign corporation shall be liable for tax under section 881(a) in the same manner as if such excess were interest paid to such foreign corporation by a wholly owned domestic corporation on the last day of such foreign corporation's taxable year.

To the extent provided by regulations, subparagraph (A) shall not apply to interest in excess of the amounts <u>reasonably expected to be allocable interest.</u> ~~reasonably expected to be deductible under section 882 in computing the effectively connected taxable income of such foreign corporation~~. [Emphasized language added and stricken language removed by the 1996 Act, effective retroactively to all tax years beginning after Dec. 31, 1986.]

On the basis of the stricken portions of the above-quoted statutory language, petitioner argues that the interest had to be deductible before the excess interest tax could apply.[13]  The above-emphasized retroactive amendments effective for the taxable years in controversy, however, obviate any ambiguity that may have existed in the language that has been retroactively stricken

---

[13]  Most unfortuitously for petitioner, the statute in question was retroactively amended subsequent to the trial of this matter and during the briefing pattern of the parties.

from the 1986 statutory version. See 1996 Act sec. 1704(f)(3)(A)(iii), 110 Stat. 1879, amending section 884(f) retroactively for tax year beginning after December 31, 1986.

The report of the House Ways and Means Committee accompanying the 1996 Act makes it clear that the retroactive amendments were intended to address an argument similar to that made by petitioner in this case. In explaining the provision, the report contains the statement that

> The bill provides that the branch level interest tax on interest not actually paid by the branch applies to any interest which is allocable to income which is effectively connected with the conduct of a trade or business in the United States. * * * [H. Rept. 104-586, at 174 (1996).[14]]

By way of comparison the House report also states, regarding the withholding of tax from payments by a U.S. subsidiary to its foreign parent, that

---

[14] The Small Business Job Protection Act of 1996 (1996 Act), Pub. L. 104-188, 110 Stat. 1755, was intended to clarify rather than change the branch profit tax provision. Even in the context of sec. 884 as enacted by the Tax Reform Act of 1986 (TRA '86), Pub. L. 99-514, 100 Stat. 2085, and prior to amendment by the 1996 Act, we think that petitioner's argument would not be persuasive. The House conference report in connection with the TRA '86 clearly undermines petitioner's position by demarcating between interest allocated to a foreign corporation's U.S. branch under sec. 1.882-5, Income Tax Regs., and interest "actually paid" by the branch. See H. Conf. Rept. 99-841 (Vol. II), at II-646 (1986), 1986-3 C.B. (Vol. 4) 1, 646-649. In addition, the General Explanation of TRA '86 appears to be consistent with respondent's interpretation of the applicability of the excess interest tax. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1037 (J. Comm. Print 1987).

In the case of a U.S. subsidiary of a foreign parent corporation, the withholding tax applies without regard to whether the interest payment is currently deductible by the U.S. subsidiary. For example, deductions for interest may be delayed or denied under section 163, 263, 263A, 266, 267, or 469, but it is still subject (or not subject) to withholding when paid without regard to the operation of those provisions.

*       *       *       *       *       *       *

These provisions are effective as if they were made by the Tax Reform Act of 1986. [Id. at 173-174.]

We are persuaded that in enacting and retroactively amending section 884, Congress did not intend to allow the principles of section 267 to preempt the parity between U.S. branches and subsidiaries of foreign corporations that the excess interest tax was designed and intended to accomplish.

Accordingly, we hold that interest expense allocable to the ECI of a branch of a foreign corporation is taken into account for purposes of section 884(f)(1)(B) even if the interest is rendered nondeductible by section 267. We reject petitioner's contention that the deductibility of the interest is a prerequisite for inclusion in the calculation of a foreign corporation's excess interest tax liability under section 884(f)(1)(B), and we find that petitioner is subject to the excess interest tax provisions.[15]

---

[15] Our conclusion is further reinforced by commentators who, generally, have supported the proposition that the actual deductibility is not a prerequisite for the application of the excess interest tax. See Blessing & Markwardt, 909-2d Tax

(continued...)

Petitioner's Untimely Treaty Discrimination Argument--
Alternatively, if we find the excess interest provisions
applicable, then petitioner argues that section 884(f)(1)(B)
violates article VII (Nondiscrimination) of the treaty.  The
antidiscrimination argument was raised for the first time in
petitioner's reply brief (the final brief in a seriatim briefing
pattern), following respondent's answering and petitioner's
opening briefs.  Although petitioner fashions its argument as
though it were in response to respondent's arguments made on
brief, we find that this position or argument was, to the Court's
knowledge, not raised by petitioner prior to trial, and it was
not raised during trial or in petitioner's opening brief.  Thus,
respondent was not afforded an opportunity to address
petitioner's position.  Petitioner points out that the
Commissioner, in Notice 89-80, 1989-2 C.B. 394, articulated the
position that the excess interest tax provisions do not violate
nondiscrimination provisions of several income tax treaties,
including the one with Japan, to which the United States is a
party.  We find petitioner's attempt to raise this argument to be
untimely.[16]

---

[15](...continued)
Management, Branch Profits Tax A-33 (1994).

[16]  Petitioner made the generalized argument that, as a
Japanese corporation, it would be treated "less favorably"
because it is "subject to more burdensome taxes" than a similarly
(continued...)

Are the Ginter and Gomes Properties To Be Included in the
Computation of the Excess Interest Tax?--Next, petitioner
contends that the related-party debt and resulting interest
connected with the Ginter and Gomes properties should not be
included in the base used to compute the excess interest tax.
Petitioner's argument concerns the computation of the excess
interest tax provided by section 884(f)(1)(B).  Under those
provisions, excess interest is computed by subtracting interest
paid by the U.S. branch (branch interest) from the amount of
interest allocable to ECI under section 1.882-5, Income Tax Regs.
Section 1.882-5, Income Tax Regs., provides a three-step process
for determining the amount of interest allocable to ECI.  The
first step determines which assets are U.S. connected by
ascertaining which assets generate ECI from the conduct of a
trade or business in the United States.  Sec. 1.882-5(b)(1),

---

[16](...continued)
situated domestic corporation.  In addition, petitioner contends
that sec. 1.884-1(e)(3), Income Tax Regs., violates the
nondiscrimination clause.  Petitioner has not made any specific
arguments showing any particular discrimination.  For example,
petitioner has not shown or argued that there was no income
against which "excess interest" could be applied or that the tax
on excess interest exceeds petitioner's potential tax benefit
from ECI.  Petitioner, using the discrimination argument as a
stalking horse, contends that by providing a taxpayer with the
ability to reduce its U.S.-connected liabilities under sec.
1.884-1(e)(3), Income Tax Regs., without any limitation, there
would be no conflict with the nondiscrimination clause herein.
In general terms, petitioner's loosely formulated discrimination
argument is contrary to the purposes underlying sec. 884 and
without specificity or support.

Income Tax Regs. In the second step, the amount of U.S.-connected liabilities is determined based on a "fixed" or "actual" ratio. The latter is the ratio of the foreign corporation's worldwide liabilities to its worldwide assets. Sec. 1.882-5(b)(2), Income Tax Regs. In the third step, the U.S.-connected liabilities are multiplied by an appropriate interest rate to arrive at the interest expense allocable to ECI.[17] Sec. 1.882-5(b)(3), Income Tax Regs. The branch interest is subtracted from the interest so allocable to ECI to determine the excess interest. The parties disagree over the application of the three-step process; in particular, whether the Ginter and Gomes properties are step 1 assets (assets that produce income effectively connected with the conduct of a U.S. trade or business).

_____

[17] Sec. 1.882-5(b), Income Tax Regs., was amended for taxable years beginning on or after June 6, 1996. Amended sec. 1.882-5(b)(1), Income Tax Regs., retains the three-step process for allocation of interest expense to ECI but relies on sec. 1.884-1(d), Income Tax Regs., for the definition of a step 1 "U.S. asset". Sec. 1.884-1(d)(1), Income Tax Regs., provides that an asset is a U.S. asset if "All income produced by the asset on the determination date is ECI * * * and * * * All gain from the disposition of the asset would be ECI if the asset were disposed of on * * * [the determination date] and the disposition produced gain." As an example of real property which is not connected to a U.S. business, the regulation describes a U.S. condominium apartment owned by the foreign corporation which would not produce ECI if sold. See sec. 1.884-1(d)(2)(xi), Example (3), Income Tax Regs.

In connection with the resolution of the "step 1 controversy", we also address the validity and effect of petitioner's attempted retroactive liability election under section 1.884-1(e)(3), Income Tax Regs.  Section 1.884-1(e)(3), Income Tax Regs., provides an election under which a foreign corporation may reduce its U.S.-connected liabilities.  The effect of the election is to decrease the amount of interest expense allocated to ECI and, consequently, decrease the amount of excess interest.[18]

On its original returns, petitioner computed the interest allocable to ECI based on all assets, including the Ginter and Gomes properties, as "step 1 assets".  In step 2, petitioner's U.S.-connected liabilities were reported as equal to its worldwide liabilities.  Finally, in step 3, petitioner treated all of its worldwide liabilities, including the advances from its parent and another related corporation, as shown on the books of its U.S. trade or business.  On the original returns,

---

[18]  Sec. 1.884-1(e)(3), Income Tax Regs., containing the election for reducing the amount of excess interest, was promulgated in 1992, after the years in issue but before petitioner filed amended returns for those years.  The temporary regulations under sec. 884 that existed during the years in issue did not provide for a similar election.  Respondent does not argue that petitioner should not be permitted to retroactively apply the regulatory election to the years in issue.  Treating this as a concession by respondent for purposes of this case, we do not make any decision regarding the validity of retroactive application of the sec. 1.884-4(e), Income Tax Regs., election to years prior to the year in which the regulation was promulgated.

petitioner's interest expense allocable to ECI equaled all of its interest, including the amounts paid to third-party banks and the amounts accrued in connection with the advances from related parties.

After respondent began the audit and raised the excess interest tax issue, petitioner, in an attempt to eliminate any excess interest tax liability, filed amended returns attempting to elect to reduce its liabilities under section 1.884-1(e)(3), Income Tax Regs. In this regard, respondent points out that a foreign corporation may elect to reduce its U.S. liabilities by an amount that does not exceed the excess of U.S.-connected liabilities (determined under section 1.882-5, Income Tax Regs.) over the liabilities "shown on the books of the U.S. trade or business" (determined under either sec. 1.882-5(b)(3)(i) or (ii)). Respondent concedes that prior to the 1996 amendment, generally, section 1.882-5, Income Tax Regs., does not define with particularity the meaning of U.S.-connected liabilities that are "shown on the books".

With this background, respondent argues that petitioner's attempted election has no effect because the liabilities shown on the books of its U.S. trade or business equaled its U.S.-connected liabilities. In other words, respondent contends that petitioner must have some liabilities that were not shown on the books of a U.S. trade or business in order to make the election,

citing section 1.884-1(e)(3)(ii), Income Tax Regs.  We agree with respondent that petitioner has not shown the requisite circumstances for a liability reduction as required by section 1.884-1(e)(3)(ii), Income Tax Regs.

Now, we consider petitioner's argument that the Ginter and Gomes properties should not be included in the step 1 asset category.  If petitioner is correct that the two properties do not belong in the step 1 category, the amount of petitioner's liabilities subjected to the excess interest provisions and the amount of the excess interest tax would be reduced.

The question we must decide is whether unimproved real property which is not currently being developed is a step 1 asset.  To be included in "step 1", the asset must produce or be able to produce ECI with the conduct of a U.S. trade or business. Sec. 1.882-5(b)(1), Income Tax Regs.  Section 864(c) governs the determination of whether an asset generates ECI.  If a foreign corporation is engaged in a U.S. trade or business, income from U.S. sources is generally placed into one or the other of two categories pursuant to section 864(c)(2) and (3) to determine whether the income is effectively connected with a U.S. trade or business.  Section 864(c)(2) applies to fixed or determinable annual or periodic income and to gains from the sale of capital assets.  To determine whether such gain or income is ECI, section 864(c)(2) provides two tests: (1) Whether the income is derived

from assets used in or held for use in the conduct of the U.S. trade or business (asset use test), and (2) whether the activities of the trade or business were a material factor in the realization of the income (business activities test). Sec. 864(c)(2)(A) and (B). All other U.S.-source income, besides fixed or determinable annual or periodic income and capital gains, is treated as effectively connected with the conduct of the taxpayer's U.S. trade or business (regardless of whether an actual connection exists). Sec. 864(c)(3).

Petitioner contends that the Ginter and Gomes properties are capital assets that produce passive income rather than ECI from a U.S. trade or business. Petitioner's argument assumes that the sale of the Ginter and Gomes properties would not produce ECI under either the asset use or business activities test of section 864(c)(2). Respondent contends that the Ginter and Gomes properties are step 1 assets as petitioner had reported them on its original Forms 1120F. Respondent maintains that the Ginter and Gomes properties are ordinary income assets and would nevertheless produce ECI under section 864(c)(3). Respondent also contends that even if the Ginter and Gomes properties are capital assets, their sale would produce ECI under section 864(c)(2). As discussed below, we find that the Ginter and Gomes properties are ordinary income assets and produce ECI under section 864(c)(3).

The branch tax law conceptually encompasses income which could be characterized either as ordinary or capital in nature, and both capital and ordinary assets may produce ECI. Thus, the Ginter and Gomes properties, even if held as capital assets, could generate ECI.

For the Ginter and Gomes properties to generate ECI under section 864(c)(2) or (3), petitioner must be engaged in a trade or business within the United States. Petitioner contends that with respect to the Ginter and Gomes properties, it was not engaged in a trade or business in the United States. Petitioner relies on Neill v. Commissioner, 46 B.T.A. 197 (1942), where it was held that, without more, the mere ownership of U.S. real property, "quiescent" receipt of income therefrom, and customary acts incidental to ownership is not the carrying on of a U.S. trade or business. Conversely, where a taxpayer buys and sells real property, collects rents, pays operating expenses, taxes, and mortgage interest, makes alterations and repairs, employs labor, purchases materials, and makes contracts over a period of years, there is obvious evidence of a U.S. trade or business. Pinchot v. Commissioner, 113 F.2d 718 (2d Cir. 1940); see also De Amodio v. Commissioner, 34 T.C. 894 (1960) (active management of rental property on a "regular and continuous" basis is a U.S. trade or business), affd. 229 F.2d 623 (3d Cir. 1962); Herbert v.

<u>Commissioner</u>, 30 T.C. 26 (1958); <u>Lewenhaupt v. Commissioner</u>, 20 T.C. 151 (1953), affd. 221 F.2d 227 (9th Cir. 1955).

In <u>Neill v. Commissioner</u>, <u>supra</u>, the taxpayer did not participate in the management, operation, or maintenance of the real property other than collecting the rents which her agent in the United States sent her. We find petitioner's reliance on <u>Neill</u>, as it relates to petitioner's business purpose and generally to its business activity, to be inapposite. Petitioner was engaged in the business of real property development and was formed for the purpose of acquiring, managing, developing, and selling real property in Hawaii.

Petitioner argues that a person engaged in the business of real property development may also hold real property for passive purposes. In that connection, petitioner contends that the Ginter and Gomes properties were not used in a U.S. trade or business and do not generate ECI. See sec. 1.882-5(b)(1), Income Tax Regs. We disagree. Although there was no sale or disposition of the properties during the years in issue, petitioner's real estate activities were not those of a passive investor.

A taxpayer may hold real property primarily for sale to customers in the ordinary course of his trade or business and, at the same time, hold other real property for investment purposes. <u>Maddux Constr. Co. v. Commissioner</u>, 54 T.C. 1278, 1286 (1970);

Eline Realty Co. v. Commissioner, 35 T.C. 1, 5 (1960); Tollis v. Commissioner, T.C. Memo. 1993-63, affd. without published opinion 46 F.3d 1132 (6th Cir. 1995); Planned Communities, Inc. v. Commissioner, T.C. Memo. 1980-555.  Additionally, a capital asset may be used in a trade or business, but here petitioner argues that the assets were held for passive investment purposes. Although the primary purpose for which a taxpayer holds property may change, it is the primary purpose for which the property is held at the time of sale that usually determines its tax treatment.  Cottle v. Commissioner, 89 T.C. 467, 487 (1987); Biedermann v. Commissioner, 68 T.C. 1, 11 (1977).  However, we may consider events over the course of the ownership to determine the primary purpose for which the property is held at the time of sale.  Suburban Realty Co. v. United States, 615 F.2d 171, 183 (5th Cir. 1980).  Whether property is held primarily for sale to customers in the ordinary course of the taxpayer's trade or business is a question of fact that is to be determined on a case-by-case basis.  Gartrell v. United States, 619 F.2d 1150, 1153 (6th Cir. 1980); Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 316 (1991).

Petitioner's predecessor, Fudosan, acquired the Ginter and Gomes properties between 1973 and 1980 with the express intention of developing and selling them as residential properties. Fudosan obtained a change in the zoning classification from

agricultural or unplanned to single or multifamily residential. Due to a series of mergers, in 1986, petitioner, as a successor in interest, became the owner of the properties. Generally, petitioner continued with the approach begun by Fudosan and sought to develop the properties until it was subsequently ascertained that development costs would be insuperable. Petitioner maintained the zoning conditions and paid certain fees with respect to the properties. Petitioner held these properties as undeveloped land and derived no revenue from them during the taxable years in issue.

On its Federal income tax returns, petitioner described its activity as real estate development and property investment and real estate investment and development. In its 1989, 1990, and 1991 returns, petitioner reported $13,800,857, $13,830,400, and $11,481,780, respectively, in "Land Development Costs". The significant real property items, other than the condominium in Waikiki, were the Ginter and Gomes properties. Petitioner consistently reported on its returns that the costs of carrying the Ginter and Gomes properties were related to its business as a developer of land.

There is no question that the Ginter and Gomes properties were originally intended for development and that regular business activity was pursued to that end. Development plans were drafted and submitted to the planning commission in Hawaii.

An architect was retained to prepare plans for the proposed subdivisions. The possibility of developing a golf course in connection with the proposed Gomes subdivision was studied. At some point, however, it appears that petitioner became aware that it was not financially feasible to continue the development.

Although petitioner originally intended the Ginter and Gomes properties to be developed, impediments to development such as drainage, zoning, and lack of accessibility intermittently stalled development plans. These factors impeded development and, ultimately, made development a financial impossibility from petitioner's point of view. No efforts were made to sell the property during the years in issue. A bona fide offer and sale occurred during 1995, 4 years after the last tax year under consideration.

Generally, courts view frequent sales that generate substantial income as tending to show that property was held for sale rather than investment. Suburban Realty Co. v. United States, supra at 181; Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976). On the other hand, less frequent sales resulting in large profits tend to show that property was held for investment. Bramblett v. Commissioner, 960 F.2d 526 (5th Cir. 1992), revg. T.C. Memo. 1990-296.

We hold that the Ginter and Gomes properties are step 1 assets includable in the computation of the excess interest tax.

Petitioner's trade or business consisted of real estate activity in Hawaii. It acquired, undertook to develop, and held properties, including the Ginter and Gomes properties, for sale to customers in the ordinary course of its real estate development business. We cannot make the type of distinction petitioner makes between the Ginter and Gomes properties and the other properties held by petitioner. Petitioner's sales activity was generally sporadic and occurred in large amounts (in the millions of dollars). The sales occurring in the years under consideration were no different from the Ginter and Gomes sale in 1995. Although petitioner decided that further development was not warranted, the Ginter and Gomes properties were held for sale and were sold to the first bona fide offeror.

Section 6651(a) Addition to Tax

Respondent also determined that petitioner is liable for an addition to tax for 1991 under section 6651(a)(1) for its failure to file a timely return. Section 6651(a)(1) imposes an addition to tax of 5 percent of the tax due for each month a return is delinquent, not to exceed 25 percent. The addition does not apply if the failure to timely file is due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). Petitioner filed its 1991 return past its due date and has failed to show that its failure to file a timely return was due to reasonable

cause and not due to willful neglect.  We find that petitioner is liable for the addition to tax under section 6651(a)(1) for 1991.

<u>Decision will be entered</u>

<u>for respondent.</u>