T.C. Memo. 2004-4

UNITED STATES TAX COURT

CSABA L. MAGASSY AND FRANCES H. MAGASSY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11982-01.                  Filed January 5, 2004.

<u>Glen A. Stankee</u>, for petitioners.

<u>W. Robert Abramitis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1995 | $245,790 |
| 1996 | 364,462 |
| 1997 | 989,450 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

The primary issue for decision is whether, during the years in issue, petitioner Csaba L. Magassy and an S corporation, in which Csaba L. Magassy was the sole shareholder and director, were involved in the restoration, charter, and sale of a Feadship yacht with a profit objective.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners are husband and wife and resided in Potomac, Maryland, at the time the petition was filed.[1] Petitioners have three children -- two sons and a daughter.

Petitioner has a successful medical practice in the Washington, D.C. metropolitan area with a specialty in plastic surgery.

On March 1, 1990, Bill Norman (Norman), petitioner's brother-in-law, suggested that petitioner purchase a particular 108' Feadship yacht, which was then located in Florida and which was being offered for sale through Lee Mogul (Mogul), the father of Mark Mogul, one of Norman's employees. Mogul owned a yacht brokerage business, Boats, Yachts & Ships, Inc., which was located in Ft. Lauderdale, Florida.

---

[1]    Hereinafter, references to petitioner in the singular are to Csaba L. Magassy.

Feadship yachts are built in the Netherlands by a consortium of Dutch shipbuilders and are generally recognized as at the top of the luxury superyacht market.  Feadship stands for "First Export Association of Dutch Shipbuilders".  Feadship yachts are built and sold under the advertising slogan "Feadship design and build the most perfect luxury yachts in the World."

It was represented to petitioner that the particular Feadship brought to his attention was owned by Boats, Yachts & Ships and that it had been custom built in approximately 1963 for Henry Ford II.  Also, it was represented to petitioner that the Feadship was being offered for sale under distress conditions and that the Feadship could be restored and resold at a substantial profit.

Petitioner was provided a written copy of a marine survey of the Feadship in which it was represented that the fair market value of the Feadship was $2.4 million and that the replacement cost to purchase a brand new Feadship of the same size would be more than $9 million.  The survey provided to petitioner, however, was incomplete because the Feadship had not been pulled out of the water for inspection of the steel hull for corrosion and rust.  As a result, petitioner was not aware of the actual condition of the hull.  Further, the survey did not include an estimate of the restoration costs for the Feadship, and

petitioner did not independently investigate what those restoration costs might be.

Neither petitioner, any members of petitioners' family, nor Norman had any experience buying, owning, selling, operating, or chartering yachts.

On March 1, 1990, without going to Florida to see and inspect the Feadship, petitioner signed a written contract to purchase the Feadship for $1.625 million. On the next day, petitioner signed an addendum to the purchase contract restating his purchase price for the Feadship to be $1.3 million. At the time petitioner signed the purchase contract, he made a cash downpayment of $100,000 to Boats, Yachts & Ships. Petitioner was to pay the balance of the purchase price at closing.

In the above written contract, the stated owner and seller of the Feadship was Boats, Yachts & Ships, Mogul's yacht brokerage firm located in Florida. On March 1, 1990, however, Boats, Yachts & Ships did not actually own the Feadship. Rather, Boats, Yachts & Ships apparently purchased the yacht on May 30, 1990, for a stated purchase price of $1 million, pursuant to a contract entered into on or about March 28, 1990, with the former owner of the Feadship.

The former owner of the Feadship also paid Boats, Yachts & Ships a "commission" of $245,620.50, apparently in connection with the sale of the Feadship to petitioner.

In the March 2, 1990, addendum to the written purchase contract between petitioner and Boats, Yachts & Ships, it was stated that approximately $300,000 of the proceeds to be received from petitioner on his purchase of the Feadship would be used by Boats, Yachts & Ships to pay for a "complete refurbishment" of the Feadship.

Although Mark Mogul and Norman were not required to share in either the subsequent costs of restoration or maintenance of the Feadship, in the written contract dated March 1, 1990, petitioner agreed to share with Mark Mogul and with Norman all of the profits realized on a subsequent sale of the Feadship by petitioner.  Under this contract, on a subsequent sale of the Feadship, petitioner was to retain 75 percent of any profits, and Mark Mogul and Norman were to divide equally 25 percent of any profits.

At the time of his purchase of the Feadship in March of 1990, petitioner had no written business plan for the restoration and resale of the Feadship, and, at trial, petitioner had no recollection as to how the above percentage split of any profits that might be realized on a resale was agreed to.

On May 9, 1990, a second marine survey of the Feadship was prepared.  Therein, it was stated that the fair market value of the Feadship was $1.85 million, that if the Feadship was restored

to "Bristol" condition[2] the fair market value of the Feadship would increase to $3.2 million, and that replacement of the Feadship purchased by petitioner with a brand new Feadship of the same size would cost petitioner $8.7 million. Like the first survey, however, this second survey was incomplete in that the Feadship was not removed from the water and the hull was not inspected. Also, the second survey did not reflect an estimate of the restoration costs of the Feadship to Bristol condition.

As of the May 29, 1990, closing of petitioner's purchase of the Feadship, petitioner still had neither inspected nor seen the Feadship. Also, petitioner was not present at the closing.

To assist with his purchase of the Feadship, petitioner obtained a secured bank loan for $1 million. Petitioner paid the proceeds of this loan toward the purchase price of the Feadship.

For a number of months after petitioner's purchase, the Feadship remained in Florida in the control of Mogul at the facilities of Boats, Yachts & Ships.

In July of 1990, petitioner was in Florida and saw the Feadship for the first time and realized that the interior and exterior of the Feadship were in extremely poor condition. Despite being aware of the condition of the Feadship, petitioner

---

[2] Bristol condition refers to a yacht as being in very good condition, with the varnish, paint, engines, and general condition in a condition as good as or better than that of a first-class hotel.

obtained a loan for $300,000 and paid $200,000 thereof to Boats, Yachts & Ships. The record is not clear as to the exact purpose for this $200,000 payment, but presumably it was the final payment due on petitioner's purchase of the Feadship.

In November of 1990, petitioner again saw the Feadship in Florida. At that time, petitioner was advised that the full $300,000 designated for restoration of the Feadship had been spent even though little progress had been made on the Feadship's restoration.[3]

Petitioner then sought advice about the Feadship from John Weller (Weller), a friend of his brother-in-law, Norman. Weller put petitioner in contact with one of his friends who owned Angus Yachts (Angus), a shipyard in Alabama. In January of 1991, petitioner paid to have the Feadship moved to Angus's Alabama shipyard for further restoration work. Representatives of Angus estimated that the total cost to restore the Feadship would be $218,000, but petitioner established no budget or limit for the restoration work to be performed by Angus on the Feadship.

After Angus had worked on the Feadship for several months, petitioner hired an individual referred to as Captain Anthony

---

[3] On July 26, 1991, petitioner filed a lawsuit against Mogul, Mark Mogul, and Boats, Yachts & Ships, seeking to recover the $300,000 that was to pay for restoration of the Feadship. Petitioner, however, never effected service on the above named defendants in the lawsuit, and on Oct. 11, 1991, Boats, Yachts & Ships was administratively dissolved as a corporation by the Florida secretary of state.

Coby (Captain Coby), who was recommended to him by Weller, to oversee the restoration work being done on the Feadship. In July of 1991, and for the first time during petitioner's ownership of the Feadship, the Feadship was removed from the water for inspection of the steel hull, as a result of which extensive rust on and corrosion to the hull of the Feadship were observed. Thereafter, Captain Coby mailed periodic letters to petitioner, reporting on the continuing problems with Angus's work on the Feadship.

As of November 21, 1991, petitioner had paid Angus $428,647, and Angus had billed petitioner an additional $527,637 for restoration work on the Feadship.

In November of 1991, Captain Coby advised petitioner that the restoration work being performed by Angus on the Feadship had become a "gravy train" for Angus. At that time, petitioner refused to pay Angus the above $527,637 in additional charges relating to work that had been done on the Feadship during August through November of 1991.

On December 6, 1991, Angus filed suit against petitioner, seeking to enforce a maritime lien against the Feadship relating to Angus's outstanding charges to petitioner.

In the spring of 1992, petitioner obtained tax advice from a Washington, D.C. law firm relating to the Feadship. At that time, petitioner's costs relating to his purchase and to the

restoration of the Feadship totaled approximately $2 million.  A memorandum petitioner received from the law firm noted that petitioner's cumulative costs in purchasing and restoring the Feadship exceeded the Feadship's fair market value and that yet additional significant costs would be necessary to complete the restoration of the Feadship.  Petitioner was advised that a sale of the Feadship before completion of the restoration work and without establishing a yacht chartering operation for the Feadship would preclude treatment by petitioner of any loss on the sale of the Feadship as an ordinary loss under section 1231.

In November of 1992, petitioners and Angus settled the above-referenced lawsuit pursuant to which petitioner agreed to pay Angus an additional $480,000 -- $300,000 in cash and a $180,000 promissory note with principal and interest due in 3 years.  Petitioner paid Angus the $300,000, and Angus released the maritime lien on the Feadship.  With petitioner's consent, Captain Coby then transported the Feadship to a shipyard in Bayou La Batre, Alabama.

At the shipyard in Bayou La Batre, much of the prior restoration work that had been done by Angus on the Feadship, at a cost to petitioner of approximately $1 million, was determined to be in need of being redone either because the work was defective or for other reasons.  From late 1992 until June of

1994, petitioner incurred additional costs of approximately $450,000 relating to continuing work on the Feadship.

With petitioner's consent, in June of 1994, Captain Coby transported the Feadship to the Merrill Stevens Boat Yard in Miami, Florida, where Captain Coby continued to supervise restoration work on the Feadship for which petitioner paid at least an additional $456,000.

On December 7, 1994, petitioner organized S.M.S.M., Inc. (SMSM), as a Florida corporation for the stated purpose of chartering the Feadship. SMSM made a timely S corporation election, and at all relevant times, petitioner was the sole shareholder and director of SMSM.

On December 14, 1994, petitioner entered into an agreement with Richard Bertram Yachts to list the Feadship for sale. The listing agreement stated an asking price for the Feadship of $2.4 million. This asking price was significantly less than petitioner's cumulative costs of approximately $3.5 million relating to his purchase and restoration work on the Feadship.

On December 24, 1994, the Feadship was moved to another shipyard in Florida for yet further restoration work. At this time, Mrs. Magassy became involved, incurring additional costs of approximately $222,000 primarily in decorating the interior of the Feadship.

On January 27, 1995, SMSM signed a charter agreement with Priscilla Yacht Management under which the Feadship became a part of Priscilla Yacht Management's charter fleet operation. On February 10, 1995, petitioner registered SMSM with the Florida Department of Revenue as a sales and charter boat dealer.

On March 8, 1995, petitioner transferred title to the Feadship to SMSM. Checking and credit card accounts were established in the name of SMSM, and SMSM borrowed $874,000 to refinance and to pay off the remaining balance on the $1 million loan that petitioner had obtained to purchase the Feadship.

None of the members of the Magassy family were qualified yachtsmen. From approximately March 16 through March 18, 1995, however, Mrs. Magassy and petitioners' three children were aboard the Feadship during the Feadship's first sea trial from Ft. Lauderdale, Florida, to Port Lucaya, Bahamas. From March 24 through March 27, 1995, petitioners and their sons were aboard the Feadship during a sea trial of the Feadship from Ft. Lauderdale to Hurricane Hole, Bahamas. On at least three additional occasions, different Magassy family members took personal vacations on board the Feadship while it was in the Bahamas.

On a number of occasions during 1995, 1996, and 1997, petitioners held dinner cruises and cocktail parties on the Feadship. Also, on occasion, without staying overnight, Magassy

family members spent daytime and evening hours partying on the Feadship.

From 1995 through 1997, while still listed for sale, the Feadship was chartered to a number of paying customers and received charter fees as follows:

| Date of Charter | Customer | Charter Fees |
|---|---|---|
| **1995** | | |
| Apr. 11-20, 1995 | Dr. P. George | $ 18,000 |
| June 2-6, 1995 | PSA* | 20,000 |
| July 3-12, 1995 | P. Racancello | 21,215 |
| July 26, 1995 | NECTA | 3,252 |
| Aug. 11-14, 1995 | A. Milchan | 9,000 |
| Aug. 15-19, 1995 | D. Pietro | 11,000 |
| Aug. 25-27, 1995 | D. Pietro | 5,500 |
| Sept. 1-3, 1995 | Great Northern Recyclers | 7,500 |
| Sept. 4-8, 1995 | A. Milchan | 12,000 |
| Oct. 22-Dec. 25, 1995 | PSA | 20,000 |
| Nov. 13, 1995 | Rose Photo, Inc. | 3,300 |
| Nov. 27-Dec. 5, 1995 | Blood & Wine Productions | 20,000 |
| | 1995 Total Charter Fees | $150,767 |
| **1996** | | |
| Mar. 20-Apr. 1996 | Pratt/Manson | 33,000 |
| Apr. 8-13, 1996 | N. Halliday | 14,167 |
| Apr. 20-28, 1996 | J. Meyer | 19,429 |
| July 1-5, 1996 | A. Milchan | 16,667 |
| July 23-29, 1996 | J. Pomerantz | 12,600 |
| July 31-Aug. 7, 1996 | Cunningham & Co. | 18,900 |
| Aug. 17-26, 1996 | Kaleen Charters | 21,000 |
| Dec. 26, 1996-Jan. 4, 1997 | P. Biersdorfer | 20,000 |
| | 1996 Total Charter Fees | $155,763 |
| **1997** | | |
| Apr. 9-13, 1997 | Fugger | $ 4,000 |
| | 1997 Total Charter Fees | $ 4,000 |

    * Plastic Surgery Associates is petitioner's medical practice.

As indicated, two of the above paid charters involved Plastic Surgery Associates (PSA), petitioner's medical group. Participants in the charters of the Feadship by PSA included partners and staff of petitioner's plastic surgery practice.

During both charters involving PSA, petitioner and Mrs. Magassy were on board the Feadship, and during one of those charters, petitioners' two sons were on board.

For the 1996 charter boat season, petitioner's Feadship was not listed in the Charter Databank International Listings, an important multiple listing service for a successful charter boat operation.

From the time of purchase in 1990 and through 1995, the first year of chartering the Feadship, petitioner kept invoices and copies of checks relating to payment of the restoration costs of the Feadship. During this period, however, petitioner's books and records relating to the Feadship were not complete.

Between 1990 and 1994, petitioner incurred more than $334,000 in interest expenses relating to the $1 million and the $300,000 loans petitioner obtained to purchase the Feadship.

Before 1996, incomplete books and records were maintained relating to petitioner's and SMSM's costs and expenses for the restoration work on the Feadship and for the charter of the Feadship.

In 1996, Midge McKee Hopkins (Hopkins), the longtime bookkeeper for PSA, began maintaining computerized books and records relating to the Feadship and to write the checks to pay the bills relating to the Feadship. Each month, Hopkins received an envelope of bills, bank registers, and bank statements from

Mrs. Magassy relating to the Feadship. Hopkins did not attempt to verify the business purpose of any of the bills she paid relating to the Feadship.

During 1995, 1996, and 1997, when Mrs. Magassy visited the Feadship in Florida, she would charge her airline ticket, her hotel and car rental expenses, and her restaurant meals on her personal credit card, and the expenses were treated by SMSM as business expenses.

On April 29, 1997, SMSM sold the Feadship to Classic Yachts Restoration, Ltd., for $1.1 million.

The charter income and claimed ordinary business expenses and losses of SMSM (as an S corporation) (including the 1997 loss on the sale of the Feadship) relating to the Feadship that were reflected on SMSM's Federal income tax returns for 1995, 1996, and 1997, and that were passed through to petitioners' joint Federal income tax returns for each year, are reflected below:

|                                        | 1995      | 1996        | 1997        |
|----------------------------------------|-----------|-------------|-------------|
| Charter Income                         |           |             |             |
| Gross receipts                         | $156,443  | $ 135,572   | $ 14,262    |
| Other income                           |           |             | 4,023       |
| Total income                           | $156,443  | $ 135,572   | $ 18,285    |
|                                        |           |             |             |
| Expenses                               |           |             |             |
| Salaries                               | $ 68,285  | $ 129,924   | $ 37,914    |
| Repairs                                | 1,211     | 68,111      | 6,153       |
| Rents                                  | 25,212    | 32,702      | 4,013       |
| Taxes and licenses                     |           |             | 9,919       |
| Interest                               | 40,153    | 63,666      | 21,931      |
| Depreciation                           | 466,961   | 837,314     | 331,977     |
| Advertising                            | 13,749    | 13,061      |             |
| Other deductions                       |           |             |             |
| Travel, meals, and entertainment       | 1,519     | 6,359       | 1,752       |
| Administrative                         | 2,042     | 6,010       | 2,041       |
| Auto                                   | 146       |             | 595         |
| Fuel                                   |           | 10,687      | 1,733       |
| Bank charges                           | 865       | 283         | 112         |
| Dues & licenses                        | 635       | 3,493       |             |
| Insurance                              | 25,506    | 27,464      |             |
| Management fees                        | 8,561     | 9,515       | 3,050       |
| Outside services                       | 14,823    |             |             |
| Professional fees                      | 12,794    | 11,414      | 41,142      |
| Supplies                               | 39,437    | 22,773      | 4,541       |
| Telephone                              | 13,982    | 7,234       | 1,657       |
| Miscellaneous                          | 17,359    | 2,285       |             |
| Uniforms                               | 5,808     | 5,520       |             |
| Office supplies                        |           | 539         | 498         |
| Payroll taxes                          |           | 14,595      | 3,935       |
|                                        |           |             |             |
| Total expenses                         | $759,048  | $1,272,949  | $ 472,963   |
|                                        |           |             |             |
| Claimed operating losses               | $602,605  | $1,137,377  | $ 454,678   |
|                                        |           |             |             |
| Claimed ordinary loss on sale of the Feadship |    |             | $1,931,292  |

On petitioners' joint Federal income tax returns for 1995, 1996, and 1997, the above claimed losses relating to the Feadship were offset against petitioner's taxable income from his medical

practice. As a result, if the claimed expenses relating to the Feadship are allowed in full, petitioner's losses relating to the Feadship will result in Federal income tax savings to petitioner of $245,790 for 1995, $364,462 for 1996, and $989,450 for 1997.

On audit for each of the years in issue, respondent disallowed the claimed expenses and losses relating to petitioner's restoration, charter, and sale of the Feadship.

OPINION

Generally, expenses attributable to an activity not engaged in for profit are not allowable as ordinary and necessary business expense deductions except to the extent of income from the activity. Sec. 183(a) and (b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable * * * under section 162 or under paragraph (1) or (2) of section 212."

For the expenses to be deductible under sections 162 and 212, so that the limitation of section 183 will not apply, a taxpayer must engage in or carry on an activity to which the expenses relate with an actual and honest objective of making a profit. Keanini v. Commissioner, 94 T.C. 41, 45 (1990) (citing Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Petitioners bear the burden of

proving that petitioner and SMSM engaged in the activity in question with an actual and honest objective of realizing a profit. Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396. The parties do not cite section 7491, and no claim is made herein that the burden of proof should be shifted to respondent.

Although the section 183 analysis with respect to the activities of an S corporation is applied at the corporate level, a taxpayer's objective or intent is attributable to his wholly owned S corporation. Ballard v. Commissioner, T.C. Memo. 1996-68; sec. 1.183-1(f), Income Tax Regs.

A profit objective in an earlier year does not give a taxpayer a blank check with regard to losses incurred in later years (i.e., in a later year an activity may be treated as an activity not engaged in for profit even though in an earlier year the activity may have been conducted by the taxpayer with a profit objective). See dicta in Dennis v. Commissioner, T.C. Memo. 1984-4; Daugherty v. Commissioner, T.C. Memo. 1983-188.

To determine whether a taxpayer had the requisite profit objective, we consider all of the surrounding facts and circumstances. Keanini v. Commissioner, supra at 46 (citing Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981)); Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income Tax Regs.

The regulations list several factors to consider in analyzing whether a profit objective exists, none of which generally is alone determinative. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990). Some factors may be given more weight than others because they may be more meaningfully applied to the evidence in a particular case. Hendricks v. Commissioner, supra at 98; sec. 1.183-2(b), Income Tax Regs.

On the sale of property, under section 1231 a taxpayer may treat a net loss on the sale as an ordinary loss only if the loss involved a sale of property that was used in the taxpayer's trade or business. Sec. 1231(a)(2) and (3) and (b). In analyzing whether an activity in connection with which property is sold constituted a trade or business (for purposes of ordinary loss treatment under section 1231), a taxpayer's profit objective, or lack thereof, relating to the activity is particularly significant. Helvering v. Highland, 124 F.2d 556, 561 (4th Cir. 1942) (involving a claim of business expense deductions under section 23(a), the predecessor of section 162(a)); Abbene v. Commissioner, T.C. Memo. 1998-330. Also relevant are factors relating to the manner, continuity, and regularity with which an activity is conducted. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); De Amodio v. Commissioner, 34 T.C. 894, 906 (1960), affd. 299 F.2d 623 (3d Cir. 1962).

Petitioners assert that for 1995, 1996, and 1997, petitioner and SMSM had an actual profit objective relating to ownership and charter of the Feadship. Petitioners assert that petitioner's and SMSM's profit objective involved a continuation of the plan petitioner adopted in 1990 when petitioner first purchased and started restoration work on the Feadship and that that profit objective expanded in 1995, 1996, and 1997 to include the charter of the Feadship while the Feadship was offered for sale.

Respondent does not dispute that in 1990, when petitioner purchased the Feadship, petitioner may have had a vague plan and objective of making some repairs and then, within a short period of time, of reselling the Feadship for profit. Respondent argues, however, that over the course of the early 1990s, petitioner's costs of restoring the Feadship became so exorbitant that by 1995 it had become clear to petitioner, and to anyone else associated with the Feadship, that a profit would not be realized either on the charter or on the sale of the Feadship. Respondent therefore argues that the claimed 1995, 1996, and 1997 expenses and losses relating to restoration, charter, and sale of the Feadship should not be allowed.

We resolve the issues presented largely by applying the factors set forth in the regulations under section 183.

Manner of Carrying On the Activity

A profit objective is suggested where a taxpayer carries on an activity in a businesslike manner and where accurate and complete books and records are maintained relating to the activity.  Sec. 1.183-2(b)(1), Income Tax Regs.  A profit objective may be suggested for an activity where the activity is conducted in a manner similar to other activities of the taxpayer which are profitable.  Id.

As discussed above, petitioner had no experience in owning a yacht, no written business plan, and no budget for the restoration costs, and petitioner made no good faith, reasonable investigation before making his investment in the Feadship.  Incomplete books and records relating to the 1995 charter of the Feadship were maintained.  Petitioner incurred substantial costs in connection with the effort to restore the Feadship without properly monitoring the work.

Expertise of Petitioners or Their Advisers

A profit objective may be indicated by a taxpayer's expertise in, research on, and study of an activity, as well as by a taxpayer's consultation with experts.  Sec. 1.183-2(b)(2), Income Tax Regs.  However, a taxpayer's reliance on the advice of someone who the taxpayer knew, or should have known, had a conflict of interest may not be reasonable.  Addington v. Commissioner, 205 F.3d 54, 59 (2d Cir. 2000), affg. T.C. Memo. 1997-259; Vojticek v. Commissioner, T.C. Memo. 1995-444 (such

advice may constitute nothing more than sales promotion).  A taxpayer generally should undertake a good faith investigation of the factors that would affect profit.  Westbrook v. Commissioner, T.C. Memo. 1993-634, affd. per curiam 68 F.3d 868 (5th Cir. 1995).

Petitioner had no expertise in purchasing yachts for resale, in owning yachts, in restoring yachts, or in chartering yachts.

Over the years, petitioner appears to have had access to business, financial, and tax advisers.  The evidence, however, is clear that petitioner did not seek independent expert advice relating to the purchase of the Feadship.  Moreover, petitioner did not investigate the cost of restoring the Feadship and did not seek independent advice regarding the viability of the plan suggested by Mogul at the time of purchase of the Feadship in 1990, and yet petitioner spent over $3.5 million on the Feadship.

Financial Status of Petitioner

Where a taxpayer has substantial income from sources other than the activity in question and where the losses from the activity, if allowed, would generate substantial tax benefits, an objective other than a profit objective is suggested.  Hendricks v. Commissioner, 32 F.3d at 99; sec. 1.183-2(b)(8), Income Tax Regs.  The limitations in section 183 are designed to prevent taxpayers from offsetting unrelated income with losses from an activity not carried on for profit.  Faulconer v. Commissioner,

748 F.2d 890, 893 (4th Cir. 1984), revg. and remanding T.C. Memo. 1983-165.

The losses petitioner claimed relating to the Feadship generated significant claimed tax savings, which, if allowed, would offset income from petitioner's unrelated medical practice.

History of Income or Losses

Substantial losses over a number of years suggest a lack of profit objective.  Sec. 1.183-2(b)(6), Income Tax Regs.  If, however, losses result because of unforeseen circumstances beyond the control of a taxpayer, the losses may bear less on the question of profit objective.  Id.

Chartering the Feadship resulted in losses to petitioner for all 3 years at issue.  The excessive costs relating to the repair and restoration work on the Feadship may have been a surprise to petitioner, but good faith, diligent, and timely investigation into the condition of the Feadship and into the nature of the luxury yacht charter business would have eliminated most of this surprise and would have provided to petitioner information upon which he would have been able to make a reasoned and calculated decision about whether to proceed further.

By 1995, petitioner's costs associated with the Feadship were so high that he should have known that charter of the Feadship would not generate income sufficient to cover those costs.  Further, in 1995, 1996, and 1997, while the Feadship was available for charter, the Feadship also was for sale at an

asking price of only $2.4 million, an amount well below the $3.5 million petitioner had already invested in the Feadship.

Opportunity for Profits From the Activity

The opportunity to earn substantial profits in a speculative venture may indicate that an activity is engaged in for profit even though losses or only occasional small profits actually result. Sec. 1.183-2(b)(7), Income Tax Regs.

Regardless of any profit objective petitioner initially in 1990 may have had when he purchased the Feadship, the $3.5 million that petitioner incurred in costs by 1995 far exceeded the $2.4 million asking price for the Feadship (indicating an expected loss on the sale), and petitioner had no reasonable basis for expecting a profit from SMSM's charter of the Feadship, which petitioner at trial acknowledged was conducted for the purpose of offsetting costs of maintaining the Feadship while it was listed for sale.

Expectation That Assets May Appreciate

An expectation that assets used in an activity may appreciate in value may indicate a profit objective. Golanty v. Commissioner, 72 T.C. at 427-428; Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965); sec. 1.183-2(b)(4), Income Tax Regs. Generally, however, an expectation that assets "may appreciate is not sufficient, in itself, to demonstrate that an activity was engaged in for profit." Hendricks v. Commissioner, supra at 100.

Although petitioner, at the time of his purchase in 1990, may have had an expectation that the Feadship would appreciate in value, the evidence before us establishes that petitioner had no such expectation during 1995, 1996, and 1997. In December of 1994, petitioner listed the Feadship for sale at $2.4 million. As discussed previously, this amount was significantly less than petitioner's cumulative purchase and restoration costs relating to the Feadship.

As stated, petitioner acknowledged that the purpose of chartering the Feadship in 1995, 1996, and 1997 was to offset the costs of operating the Feadship while it was listed for sale. As one of petitioners' witnesses testified, "if * * * you charter a boat, you can make a couple of bucks * * *."

Time and Effort Expended by Petitioners

A profit objective may be indicated by the amount of personal time and effort a taxpayer devotes to carrying on an activity. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioner's time during the years at issue was largely devoted to his medical practice, allowing petitioner little time to devote to matters relating to the restoration and to the charter of the Feadship.

Mrs. Magassy's efforts relating to the interior design of the Feadship occurred well after the major costs of the restoration on the Feadship had been incurred. Her efforts do not establish an overall profit objective for petitioner or for

SMSM in chartering the Feadship or in restoring the Feadship for resale.

## Success in Carrying On Other Activities

A taxpayer's success with other business activities may indicate a profit objective. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioner is a successful plastic surgeon, but neither he nor Mrs. Magassy had engaged in activities relating to owning and operating a luxury yacht. It appears that petitioner handled decisions relating to the Feadship quite differently from the successful manner in which he practiced medicine.

## Personal Pleasure or Recreation

The mere fact that a taxpayer derives personal pleasure from an activity does not constitute a per se demonstration of a lack of profit objective. Sec. 1.183-2(b)(9), Income Tax Regs. Conversely, where an activity lacks recreational appeal, a profit objective may be indicated. Id.

Yachting inherently involves a luxury indulgence, and petitioners and petitioners' family members participated in a number of trips and entertained on the Feadship. The evidence establishes some significant personal recreational aspects to petitioner's and to SMSM's yachting activity.

Section 1231 Loss

It is clear that petitioner's original purchase of the Feadship in 1990 and his restoration efforts during the early 1990s did not constitute a trade or business and would not qualify his $1.93 million loss on the 1997 sale of the Feadship for section 1231 ordinary loss treatment. Petitioners argue, however, that the 1995, 1996, and 1997 charter activity (combined with petitioner's original 1990 profit objective for purchasing the Feadship) constituted a sufficiently regular for-profit activity that the $1.93 million claimed loss on sale of the Feadship should qualify for section 1231 ordinary loss treatment.

On the facts of this case, certainly by 1995 and thereafter through April of 1997, when petitioner sold the Feadship for $1.1 million, petitioner did not have a good faith profit objective relating either to the charter of the Feadship or to the sale of the Feadship. During 1995, 1996, and 1997, petitioner's and SMSM's objective in the charter of the Feadship was to provide funds to offset a portion of the costs of ownership of the Feadship.

Also, because of the lack of profit objective associated with the charter of the Feadship, the charter activity relating to the Feadship in 1995 through April of 1997 did not constitute a trade or business, and the Feadship does not qualify for treatment as trade or business property under section 1231. Abbene v. Commissioner, T.C. Memo. 1998-330; Budin v. Commissioner, T.C. Memo. 1994-185.

On the evidence before us, we conclude that petitioner and SMSM did not have an actual and honest objective that the Feadship would generate a profit either from its charter or from its sale.

In light of our resolution of the above issues, we need not address respondent's other arguments.

Based on the foregoing,

<u>Decision will be entered for respondent</u>.